5 F.3d 537
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 McDONALD'S CORPORATION, d/b/a McDonald's Corporation, a
Delaware Company, Plaintiff-Appellee,
v.
Lloyd David BARNES, Defendant-Appellant.
 No. 92-36552.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 5, 1993.
Decided Sept. 14, 1993.
 
 Appeal from the United States District Court for the District of Alaska, No. CV-91-067-HRH; H. Russel Holland, District Judge, Presiding.
 D.Alaska
 AFFIRMED.
 Before: SCHROEDER, FLETCHER, and ALARCON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Barnes appeals the grant of summary judgment in favor of McDonald's Corp. on Barnes' claims of misrepresentation and breach of an implied covenant of good faith and fair dealing. Pursuant to 28 U.S.C. Sec. 1291 (1988), we have jurisdiction over the timely filed appeal of the district court's final judgment.[1] We affirm.
 
 I.
 
 3
 Barnes operated the first McDonald's franchise in Sitka, Alaska. He was a "BFL franchisee," meaning that he operated his restaurant under a "Business Facilities Lease" from McDonald's. A BFL franchisee leases the real property and equipment necessary to run the restaurant, with a three-year option to purchase the equipment. By contrast, a "conventional" operator purchases the equipment at the outset.[2] A BFL franchisee becomes a conventional franchisee by exercising the option. Ordinarily, if a BFL franchise option is not exercised by the end of the lease term, McDonald's secures a new franchisee.
 
 
 4
 Barnes applied to McDonald's for a franchise. He was selected for training as a potential franchisee, and successfully completed his training (including a stint at McDonald's' Hamburger University in Oak Brook, Illinois); Barnes then signed a three-year "FRANCHISE LETTER AGREEMENT (Business Facilities)" on August 19, 1986 as a franchisee of a new Sitka McDonald's. On August 19, 1989, Barnes and McDonald's signed a second BFL, this time for one year. A third BFL, for six months only, was signed on September 27, 1990. Barnes characterizes these later agreements as "extensions" designed to enable him to acquire enough funds to be in a position to exercise the purchase option.
 
 
 5
 The option terms are set by contract; the price is based on a percentage of the gross sales of the immediately preceding twelve-month period (called the "trailing twelve" months). The terms offered Barnes were:
 
 
 6
 The purchase price shall be the greater of either 1) $485,000.00 or 2) an amount to be determined by a percentage of gross sales as follows: if the previous twelve (12) months gross sales are $1,299,999.99 or less, the price is forty-four percent (44%) of sales; if the twelve (12) months gross sales are $1,300,000.00 and up to and including $1,499,999.99, the price is forty-six percent (46%) of said sales; and if said twelve (12) month sales are $1,500,000.00 or higher, the price is forty-eight percent (48%) of said sales.
 
 
 7
 McDonald's informed Barnes in October 1990 that, according to the formula, the option price was $590,668, a figure that, because of declining sales through the end of 1990 and beginning of 1991, shrank to $571,947 by February 1991.
 
 
 8
 Barnes did not exercise the option by December 18, 1990, the date required by the BFL.[3] At his deposition, he testified that he signed the third BFL because he was led to believe that McDonald's would work with him and would lower the option price. At one point, McDonald's regional manager Ken Clement advised Barnes that, "if significant progress is made towards exercising your option, ... I'll work further with you. If not, I will place a new Operator in Sitka." CR 223, Exh. B, at 4.
 
 
 9
 Prior to entering into the third BFL with Barnes, McDonald's conducted an analysis of the Sitka restaurant, part of a "site profitability analysis" ("SPA") routinely run on licensees whose operations produced net real estate losses for McDonald's. Chief Accounting Officer Gerry Newman scrawled "315,000" on the bottom of a sheet of figures that was part of the Sitka SPA. Regional manager Bernie Schaefer sought advice from McDonald's' licensing department as to whether McDonald's had to offer Barnes a price of $315,000, a price substantially lower than the option price. When the licensing department said "no," Schaefer told Barnes that the option price was $590,668.
 
 
 10
 After Barnes failed to exercise his option, McDonald's approved the sale of the Sitka restaurant to Fritz Sabath for $315,000.[4] When Barnes refused to vacate the restaurant upon the expiration of the third BFL, McDonald's filed suit in federal court seeking an injunction. Barnes filed suit in state court, seeking equitable relief to prevent McDonald's from interfering with his operation of the restaurant. McDonald's removed Barnes' state court action to federal court, where it was consolidated with the other pending case. The district court eventually granted summary judgment in favor of McDonald's on the two substantive issues pertinent here.
 
 II.
 
 11
 Barnes argues that McDonald's had a legal duty to disclose to him material information revealing that the value of the Sitka restaurant was only roughly half the sum he was contractually obligated to pay under the BFL. He further argues that McDonald's' misrepresentations about its willingness to negotiate a lower price are legally actionable.
 
 
 12
 The district court found that because Barnes had "ample opportunity to make an independent analysis of the value of the franchise," and "had his own accountant investigate the viability of various prices under various terms of purchase," both parties were on an even factual footing and McDonald's was, therefore, "under no duty to disclose its consideration of any price other than the agreed-upon contract price." McDonald's Corp. v. Barnes, No. A91-067 Civil, slip op. at 10-11 (D.Alaska Dec. 4, 1991) ("Barnes II ").
 
 
 13
 We agree. Adopting the position of the Restatement (Second) of Torts, the Alaska Supreme Court has found that "a duty to disclose ... arise[§ when] facts ... are concealed or unlikely to be discovered because of the special relationship between the parties, the course of their dealings, or the nature of the fact itself." Matthews v. Kincaid, 746 P.2d 470, 471-72 (Alaska 1987). Here, Barnes argues that we should distinguish between what McDonald's knew, and what he, "buoyed by his accountant's input, merely belie[ved]." Blue Brief at 22. McDonald's, however, did not conceal the financial data necessary to examine the Sitka restaurant's ability to "cash flow." This date was not something that Barnes; as the "independent contractor" charged with running all of the restaurant's day-to-day operations, was unlikely to discover. Indeed, Barnes' accountant had those numbers, apparently understood their significance, and was able to advise Barnes accordingly based on his analysis of the numbers. Barnes and his accountant had information that allowed them to go beyond "mere belief" to reasoned judgment. The district court correctly rejected Barnes' claim based on non-disclosure.
 
 
 14
 Barnes also argues that McDonald's should be liable for misrepresentation because it
 
 
 15
 led him to believe that when the time actually came for him to exercise his option to purchase, McDonald's would treat him fairly and would offer him a fair price which would allow him to obtain the benefit of his bargain, i.e., he would become an owner of a McDonald's franchise for a price which would allow him to make a reasonable profit.
 
 
 16
 Blue Brief at 22-23. The district court noted that McDonald's "vigorously disputes" Barnes' version of the facts. Barnes II, slip op. at 12. Rather than denying summary judgment, however, the court determined that this disputed factual issue was not material because, even if it were assumed that Barnes' version was correct, he "failed to establish ... actual reliance on McDonald's representation" that it would be willing to renegotiate the option price. Id. at 14-15 & n. 19.
 
 
 17
 This is a somewhat closer question than the claim based on failure to disclose. However, even if we assume that a McDonald's representative orally represented that renegotiation was possible, we are compelled to conclude that reliance was not reasonable.[5] Each of the BFL agreements signed by Barnes contained this language: no "representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of the Franchise" have been made. Barnes, by signing, "agree[d] that the terms of the Franchise shall not be modified or amended in any way, except by a written document which is executed by you and McDonald's and which is specifically identified as an amendment hereto." No amendment is appended to any of the BFLs. Further, Barnes' accountant specifically advised him that "it has been our understanding that [McDonald's] does not make a habit of 'changing the deals.' "
 
 
 18
 Simply put, "[a] party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of ... a subsequently executed contract." Carlock v. Pillsbury Co., 719 F.Supp. 791, 829 (D.Minn.1989) (citing, inter alia, One-O-One Enters., Inc. v. Caruso, 668 F.Supp. 693, 699 (D.D.C.1987), aff'd, 848 F.2d 1283 (D.C.Cir.1988)). Barnes' misrepresentation claims are defeated by the express terms of the BFL agreements.
 
 
 19
 Barnes also maintains that the district court erred in failing to find that Alaska law requires each party to a contract to deal fairly with the other party, as measured by the entire history and relationship between the parties.[6]
 
 
 20
 The parties briefed the implied covenant issue initially in the context of litigating the vacation of a preliminary injunction. McDonald's Corp. v. Barnes, No. A91-067 Civil, slip op. at 2 (D.Alaska May 8, 1991) ("Barnes I "). The court phrased the issue as follows: "Did McDonald's have a duty to Barnes pursuant to a covenant of good faith and fair dealing to renegotiate the option purchase price under any circumstances?" Id. at 4. The court concluded that it could not order the parties to negotiate "in derogation of" the specific price term in the BFL. Id. at 4, 8.
 
 
 21
 "[T]he focal point of the disagreement between the parties is the purchase price under the option agreement." Id. at 7. "The contract between the parties contained a specific price term, and McDonald's was under no duty by reason of a covenant of good faith and fair dealing to alter that term." Id. The court emphasized, however, that it was not dismissing all possible covenant claims; "Barnes may yet be able to demonstrate that McDonald's acted unfairly or in bad faith during the term of the franchise agreement and that such conduct prevented Barnes from being in a position to exercise the purchase option on its express terms and conditions." Id. at 7 n. 3.
 
 
 22
 The court did not dismiss Barnes' claim based on an implied covenant of good faith and fair dealing, but it did hold that, if a breach were found, punitive damages would not be awarded. Barnes II, slip op. at 19-23. At a subsequent hearing, scheduled to determine "whether the several dispositive orders of the court have severally or collectively ruled on all aspects of ... Barnes' [claims] for misrepresentation and/or breach of the covenant of good faith and fair dealing," the court explained how its rulings lifting the preliminary injunction and granting partial summary judgments had implicitly resolved the implied covenant issue against Barnes.
 
 
 23
 Although Alaska law imposes upon each party to a contract a duty of good faith and fair dealing, Mitford v. De Lasala, 666 P.2d 1000, 1006 (Alaska 1983), and every contract in Alaska contains an implied covenant of good faith and fair dealing, Alaska Stat. Sec. 45.01.203, a party may breach the duty of good faith and fair dealing by attempting to force a renegotiation of an express, contractual price formula. Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage, 783 P.2d 1164, 1165-67 (Alaska 1989). In Hagans, Brown & Gibbs, the Alaska Supreme Court implicitly held that a law firm whose client refused to take a recommended settlement did not have a good faith and fair dealing obligation to renegotiate the fee package. Rather, as the district court in this case held, "under the right circumstances it is the party who insists upon renegotiation of a specific price term who may be in breach of this covenant." Barnes I, slip op. at 5-6.
 
 
 24
 Barnes struggled to frame a legal theory to match his moral indignation, but ultimately the district court found that he had no legal basis to require McDonald's to offer him a price better than the contract price. The district court reasoned that, "[j]ust as McDonald's would have no right to refuse to sell at the agreed-upon price, Barnes has no right to insist that he should be entitled to purchase for lesser price just because McDonald's may ultimately sell the store to a third party at a lower price than that agreed to in the McDonald's-Barnes purchase option." Id. at 6 (emphasis added). "Courts have no right to remake contracts to comport with some unspecified notion of fairness nor to refuse enforcement on that ground. That parties have been held to a duty of good faith compliance with contract terms does not create a duty to offer particular terms or to forego available contract remedies." Villegas v. Transamerica Fin. Servs., Inc., 708 P.2d 781, 784 (Ariz.Ct.App.1985) (affirming summary judgment for Transamerica, finding duty of fair dealing did not prevent it from "insisting on its contractual rights," even though to do so "forced the plaintiffs into a contract which their counsel believes was disadvantageous"); see also Lower Kuskokwim Sch. Dist. v. Alaska Diversified Contractors, Inc., 734 P.2d 62, 64 (Alaska 1987) (contract not modified or breached by requesting compliance with express term).
 
 III.
 We AFFIRM the district court.[7]
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The court entered final judgment under Federal Rule of Civil Procedure 54(b). Other issues in the underlying litigation, variously resolved by court order or stipulation between these and other parties, are not before this court
 
 
 [2]
 Under either arrangement, McDonald's retains title to the real estate
 
 
 [3]
 The first clause of the relevant BFL paragraph, "[u]pon sixty (60) days notice to McDonald's you may purchase," is designed to give McDonald's some flexibility in finding another operator if the existing BFL franchisee elects not to exercise the purchase option
 
 
 [4]
 McDonald's argues that Barnes' option contained more favorable lease terms than those reflected in Sabath's contract, and that the total costs to Sabath over the life of his agreement would be higher than those in the Barnes' option. In deciding the issues raised by Barnes on appeal, we need not determine if McDonald's comparison of the contracts is correct
 
 
 [5]
 We need not decide whether there was actual reliance
 
 
 [6]
 Barnes contends that the district court compounded its erroneous ruling by making it sua sponte, without a motion from McDonald's. An examination of the procedural posture below, however, reveals that Barnes was given every opportunity to demonstrate a viable claim for breach of the covenant of good faith and fair dealing. See infra. The district court correctly held that he had not done so
 
 
 [7]
 We have no jurisdiction over Barnes' argument that McDonald's is not entitled to attorneys' fees under Alaska law as a "prevailing party." Barnes never filed a notice of appeal of the fee issue. See Culinary & Serv. Employees Union, AFL-CIO Local 555 v. Hawaii Employee Benefit Admin., Inc., 688 F.2d 1228, 1232 (9th Cir.1982)