**ONE–O–ONE ENTERPRISES, INC., et al., Plaintiffs–Appellants,**

**v.**

**Richard E. CARUSO, et al., Defendants–Appellees.**

**No. 87–7195.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 26, 1988.

Decided June 7, 1988.

Allan S. Hoffman, with whom Samuel H. Seymour, Washington, D.C., was on the brief for plaintiffs-appellants.

Michael A. Schlanger, with whom Stephen R. Mysliwiec, Washington, D.C., was on the brief, for defendants-appellees.

Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges and PALMIERI *, Senior District Judge.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Plaintiffs-appellants One–O–One Enterprises, Inc., Guld, Inc., and Ulysses G. Auger, Sr. (hereafter referred to jointly as One–O–One) appeal from an order of the district court dismissing their complaint against defendants-appellees Richard E. Caruso, James M. Sullivan, and For Trish Co., Inc., for failure to state a claim upon which relief can be granted. *One–O–One Enters., Inc. v. Caruso*, 668 F.Supp. 693 (D.D.C.1987). Appellants' complaint tendered securities fraud claims under section 10(b) of the Securities Exchange Act of 1934 (SEA) and Rule 10b–5 promulgated thereunder, pendent state common law fraud and breach of contract claims, and a RICO claim. Appellants are not appealing dismissal of the RICO claims.

Because One–O–One failed to identify any fraudulent representations upon which it reasonably could have relied or any plausible interpretation of the contract upon which a claim of breach could be stated, we affirm the decision of the district court. Nevertheless, although it does not affect the outcome of this appeal, we indicate why we do not approve the portion of the district court's opinion, 668 F.Supp. at 699–701, concerning the existence of a security.

## I.

This case arises out of an agreement between defendants and plaintiffs concerning the disposition of 39 debt-ridden Ponderosa Steak Houses in Maryland and Virginia owned by plaintiffs. At the time the complaint was filed, Auger, Sr. and his wife owned 100% of the capital stock in Guld, Inc., a D.C. corporation that in turn owned 100% of the capital stock in One–O–

One Enterprises, Inc., a Maryland corporation engaged in the business of owning and operating the 39 Ponderosa Steak Houses. Defendants Caruso and Sullivan own all the capital stock in For Trish Co. (Trish), a Delaware shell corporation "without financial substance or sufficient capital to enable it to engage in any business activities without access to the financial resources of its stockholder/principals." Complaint ¶ 6. Caruso and Sullivan were, until June 1985, also controlling stockholders in Tenly Enterprises, Inc. (Tenly), a Pennsylvania corporation engaged in the business of owning and operating more than 70 Rustler Steak Houses in the Mid–Atlantic states.

Beginning in June 1984, Caruso and Sullivan expressed interest in purchasing One–O–One's heavily leveraged Ponderosa restaurants and converting them to Rustlers. On July 31, 1984 Caruso submitted an initial written proposal for the purchase of the Ponderosas. Plaintiffs rejected that proposal, but negotiations continued and eventually yielded a preliminary letter agreement, dated October 8, 1984, among Tenly, Auger, Sr., his son Auger, Jr., One–O–One, and Guld. According to plaintiffs' complaint, which we take to be true for purposes of this appeal, the October 8 preliminary agreement reflected prior oral representations made by defendants that they intended to maintain and expand the Rustler Steak House business "for the long-term future" and that they did not intend "to sell or dispose of their ownership interest in Tenly in the near or foreseeable future." Complaint ¶ 20.

In an endeavor to implement the October 8 preliminary agreement, defendants drafted a detailed formal agreement. This formal agreement—between One–O–One and Tenly—included provisions incorporating defendants' prior representations regarding their long-term commitment to the Rustler business. Ultimately, however, the parties were unable to conclude a final agreement based on the October 8 preliminary plan.

---

* Of the United States District Court for the Southern District of New York, sitting by designation pursuant to 28 U.S.C. § 294(d).

Negotiations resumed among the parties until they reached a new preliminary letter agreement on January 14, 1985. The new agreement, which substituted Trish for Tenly as a corporate party, contained these essential features:

(a) One–O–One would permanently convey ten of its restaurant units to Trish Co., for no cash consideration;

(b) One–O–One would convert 25 of its remaining 27 restaurant units to Rustler Steak Houses, at its own expense, and would dispose of its other two units;

(c) One–O–One would be authorized to operate the units it converted as Rustler Steak Houses for a period of up to seven years, without payment of any fees or royalties, and Trish Co. would provide advertising and promotional support for One–O–One's units at no cost to One–O–One;

(d) Auger would grant to Trish Co. an option to purchase all of the capital stock of Guld (and with it all of the capital stock of One–O–One) for the nominal sum of $100;

(e) During the six-year option period, One–O–One and Guld would apply all available revenues generated by One–O–One's Rustler Operations to reduce their outstanding indebtedness;

(f) Auger personally would service all existing Guld and One–O–One interest-bearing debt in excess of $10,200,000 in total liabilities as of the date of the final agreement, as well as any additional interest-bearing debt incurred thereafter; and

(g) Upon exercise of its option, Trish Co. would assume the liabilities of Guld and One–O–One up to a maximum amount of $10,200,000, less the amount by which their outstanding indebtedness had been reduced during the option period, and Auger would assume responsibility for the remainder of One–O–One's and Guld's obligations.

Complaint ¶ 26. A Final Agreement dated February 4, 1985 embodying these terms was executed by the parties and delivered on March 8, 1985; One–O–One thereupon conveyed to Tenly, as Trish's assignee, nine of its ten specified restaurant properties and began to convert 25 of its remaining Ponderosas to Rustlers. This 1985 Final Agreement, in contrast to the previous formal agreement based on the understandings reflected in the October 8, 1984 letter agreement, contained no statement regarding Tenly's long-term commitment to the Rustlers. The Agreement did, on the other hand, conclude with an integration clause in which the parties agreed that the Final Agreement "supercede[d] any and all previous understandings and agreements." Joint Appendix (J.A.) at 194.

Beginning in November 1984, continuing through June 1985, and unknown to plaintiffs, Caruso and Sullivan entered into negotiations to sell Tenly to Sizzler Restaurants, Inc. (Sizzler), a California corporation that owns, operates, and franchises steak houses under the Sizzler name. Sizzler intended to phase out the Rustler system after acquiring Tenly. In late June of 1985 Sizzler purchased Tenly and obtained an option to purchase all of Trish's stock.

By the time One–O–One learned that Sizzler had purchased Tenly, One–O–One had converted a number of its restaurants to Rustlers and was in the process of converting the rest. As Sizzler began converting Tenly's Rustlers to Sizzlers, the level of promotional effort devoted to Rustlers diminished markedly, "causing One–O–One's Rustler units economically to perform far more poorly than if the Rustler chain were aggressively promoted, supported with an adequate advertising and marketing effort and, generally, managed and operated with a view towards the perpetuation and expansion of the Rustler Steak House system." Complaint ¶ 36. By the end of 1985, One–O–One could no longer sustain the continuing losses on its remaining Rustlers. On May 2, 1986, One–O–One sold all but one of its Rustlers to Sizzler, having already sold the 25th Rustler to another buyer in February 1986.

On July 15, 1986, more than one year after One–O–One learned of the sale of Tenly to Sizzler, plaintiffs filed the present

action seeking to recover approximately $7,600,000 in damages (or thrice that under the now-abandoned RICO claim) that they allegedly sustained because defendants fraudulently induced them to enter into a contract granting Trish an option to purchase the stock of One-O-One.

The defendants moved to dismiss the complaint for failure to state a claim, and the district court granted the motion, finding *inter alia:* (1) the representations upon which plaintiffs based their fraud, securities fraud, and RICO claims were not reasonably relied upon because the contract at issue was fully integrated; (2) the provision of the contract upon which plaintiffs based their breach of contract claim unambiguously precluded such a claim; and (3) the stock option for which the contract provided did not qualify as a security for purposes of stating a securities fraud claim under the SEA. Plaintiffs-appellants timely appealed the district court's dismissal order; we affirm the judgment of that court but correct its misstep with respect to the definition of a security.

## II.

### A. *Fraud*

■ To state a claim of fraud or securities fraud upon which relief can be granted, plaintiffs' allegations must indicate that their reliance on the allegedly fraudulent representations was reasonable. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987) ("To establish a claim under section 10(b) of the Securities Exchange Act, a plaintiff must prove, in connection with the purchase [or sale] of a security ... that [its] reliance [upon false representations or omissions] was justifiable."); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170 (S.D.N.Y.1988) (same); *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 629 (4th Cir.) (applying Maryland common law of fraud), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Isen v. Calvert Corp.*, 379 F.2d 126,

130 (D.C.Cir.1967) (applying District of Columbia common law of fraud).[1]

Plaintiffs base their fraud claims on defendants' representations, made orally in the October 8 letter agreement and in the follow-up, but unexecuted, formal agreement, that defendants would retain a controlling interest in Tenly and that Tenly would undertake a long-term commitment to maintain and expand the Rustlers; plaintiffs also assert that defendants' failure to disclose the negotiations between Tenly and Sizzler for the sale of Tenly's Rustlers constituted a fraudulent nondisclosure of material information. These false representations and omissions, plaintiffs maintain, fraudulently induced them to enter into a contract with defendants.

■ Defendants assert here, as they did successfully before the district court, that the integration clause of the 1985 Final Agreement providing that that Agreement "supercede[d] any and all previous understandings and agreements," J.A. at 194, made any reliance by plaintiffs on prior representations concerning Tenly's long-term commitment to the Rustler operation unreasonable and any failure by defendants to disclose the existence of negotiations with Sizzler immaterial. We agree. As the district court cogently observed:

After eight months of vigorous negotiations, the parties reached a final agreement that was lengthy, detailed and comprehensive. During these eight months many offers, promises and representations were made.... To avoid a misunderstanding and to make clear that the only understanding between the parties was that expressed in the Agreement, the parties agreed that the Agreement *"supersede[d] any and all previous understandings and agreements."* ... Even if Sullivan and Caruso had previously agreed not to divest their interest in Tenly, the Agreement explicitly superseded the previous representations. Therefore, when the representations were superseded by the Agreement there

---

**1.** Maryland and District of Columbia law agree on this basic requirement for stating a claim of fraudulent misrepresentation; therefore we need not decide which body of law, Maryland's or D.C.'s, governs the pendent claims in this case.

was no representation upon which plaintiffs could [reasonably] base a fraud claim.

668 F.Supp. at 698 (emphasis in original). Were we to permit plaintiffs' use of the defendants' prior representations (and defendants' nondisclosure of negotiations inconsistent with those representations) to defeat the clear words and purpose of the Final Agreement's integration clause, "contracts would not be worth the paper on which they are written." *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C.1968), quoting *Toledo Computing Scale Co. v. Garrison*, 28 App.D.C. 243, 249 (1906). On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment or excision of those earlier representations. *See, e.g., Kardios Sys. Corp. v. Perkin–Elmer Corp.*, 645 F.Supp. 506, 509–10 (D.Md.1986) (removal of "best efforts" provision from final agreement constituted affirmative excision of this term).

Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who "has been induced by a fraudulent misrepresentation to enter the contract," *Giotis v. Lampkin*, 145 A.2d 779, 781 (D.C.1958); *Standard Motor Co. v. Peltzer*, 147 Md. 509, 128 A. 451 (1925), must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." *Call Carl*, 554 F.2d at 630; *accord Tonn v. Philco Corp.*, 241 A.2d at 445. We need not belabor the point. We have here the case of "a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice"; such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement." *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp.

666, 671–72 (N.D.Ga.1982), *aff'd mem. sub nom. Computer Dimensions, Inc. v. Basic Four*, 747 F.2d 708 (11th Cir.1984).

**B. "Security"**

█ The district court need not have reached beyond the "unreasonable reliance" ruling to dismiss the common law and securities fraud claims. That court ventured further, however, to announce an alternative ground for dismissing the securities claim. Relying on the test for the existence of a security in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), the district court held that the option granted Trish in the 1985 Final Agreement to purchase all of the capital stock in Guld, Inc. was not a "security" within the meaning of section 3(a)(10) of the SEA, 15 U.S.C. § 78c(a)(10).

To be a security transaction under the *Howey* test a transaction must involve (1) "an investment of money"; (2) "in a common enterprise"; (3) "with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104. The district court found, correctly, that because of Trish's commitment to provide marketing and promotional services, training, and ongoing advice and training, the profits from the transaction would not come "solely from the efforts of others" but would, in a not insignificant way, come from defendants' efforts as well. The stock option, therefore, was not a security under the *Howey* test.

The district court, we believe, applied the wrong test. In *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), and *Gould v. Ruefenacht*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), the Supreme Court indicated that the *Howey* test does not apply across-the-board; in relation to the sale of stock, the Court announced a simpler test: the adjudicator must first determine whether the instrument denominated "stock" possesses " 'some of the significant characteristics typically associated with' stock." *Landreth*, 471 U.S. at 686, 105 S.Ct. at 2302, quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 851, 95 S.Ct.

2051, 2060, 44 L.Ed.2d 621 (1975). If "the instrument involved is traditional stock ... [t]here is no need ... to look beyond the characteristics of the instruments to determine whether the [Securities] Acts apply." *Landreth,* 471 U.S. at 690, 105 S.Ct. at 2304.

The *Landreth* Court, it is true, "expressly [left] until another day the question whether 'notes' or 'bonds' or some other category of instrument listed in the [Acts'] definition [of 'security'] might be shown 'by proving [only] the document itself[,]' ... [and held] only that 'stock' may be viewed as being in a category by itself for purposes of interpreting the scope of the Acts' definition of 'security.' " *Id.* at 694, 105 S.Ct. at 2306. Nevertheless, *Landreth* heavily emphasizes a differentiation of traditional from non-traditional "securities" instruments. *See id.* at 690, 105 S.Ct. at 2304 ("All of the cases on which respondents [who supported the *Howey* test] rely involved unusual instruments not easily characterized as 'securities.' "); *id.* at 691, 105 S.Ct. at 2304 ("[T]he *Howey* economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within *any* of the examples listed in the statutory definition of 'security.' ") (emphasis in original).

The option to purchase stock, it seems to us, is such a traditional securities instrument that its existence may be shown "by proving the document itself" without any need "to look beyond the characteristics of the instruments" and, specifically, without any need to apply the *Howey* test. *See Penturelli v. Spector, Cohen, Gadon & Rosen,* 779 F.2d 160, 164–65 (3d Cir.1985) (applying *Landreth* rather than *Howey* to a "fractional undivided interest" in coal mining rights). In reaching this conclusion, we have attended to the presence in the SEA definition of "security" not only of the term "option" but also of the phrase "any ... right to ... purchase, any of the foregoing," where "the foregoing" includes "stock." 15 U.S.C. § 78c(a)(10). The contractual option to buy all of Guld's stock established defendants' "right to purchase" that stock. The *right to purchase* an in-

strument denominated "stock" that possesses "some of the significant characteristics typically associated with stock," we think, should be subject to the same test for application of the securities laws as the instrument itself. *Cf. Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750–51, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) ("A contract to purchase or sell securities is expressly defined by § 3(a) of the 1934 Act, 15 U.S.C. § 78c(a), as a purchase or sale of securities for the purpose of that Act.") (footnote omitted).

Had the district court applied the test indicated in *Landreth,* as we conclude it should have, that court would have determined that the option to purchase Guld's stock was a security. The error of the district court in applying *Howey* to declare the stock option in question not a "security," however, does not alter the outcome of this appeal. Plaintiffs cannot prevail, as we earlier explained, because they failed to allege any fraudulent representations upon which they, as commercial entrepreneurs, *reasonably* could have relied.

## C. *Breach of Contract*

■ Finally, One–O–One asserts a breach of contract claim: they allege that defendants breached the Final Agreement's marketing clause by failing "to provide advertising and promotional support for [plaintiffs'] Rustler units of the kind, quantity or quality that the agreement requires." Complaint ¶ 66. The marketing clause of the Agreement states, in part:

> Trish Co. shall be responsible for providing the marketing and promotion programs of the 25 Restaurant Properties, which shall be conducted in a manner essentially consistent with the marketing and promotion programs of the current or then existing Rustler Steak Houses in the Baltimore and Washington, D.C. markets.

J.A. at 169.

The terms "shall be ... consistent with ... the current or then existing [Rustlers]," the district court held, "make clear that the level of future advertising for

plaintiffs' Rustlers must be consistent with the level of advertising for the other Rustlers. Therefore, because plaintiffs do not allege that any disparity exists between the level of advertising for plaintiff's [sic] Rustlers and the other Rustlers, plaintiffs have not stated a claim for breach of contract." 668 F.Supp. at 702.

One–O–One counters that "shall be ... consistent with ... the current or then existing [Rustlers]" refers to the level of advertising obtaining during the February 1985 negotiations and not to a continuing consistency in the level of advertising between plaintiffs' and defendants' Rustlers without regard to any baseline level. Alternately, appellants argue that if the marketing clause is ambiguous as between these two constructions, summary dismissal is precluded.

In common with the district court, we see no ambiguity. *See Horn & Hardart Co. v. National R.R. Passenger Corp.*, 793 F.2d 356, 359 (D.C.Cir.1986) ("the construction of *unambiguous* contractual language is a matter of law entrusted to the court") (emphasis in original). The marketing clause uses explicitly relative terms to identify the required level of advertising; it pegs the level of advertising for One–O–One's newly converted Rustlers to the level for all other Rustlers in the Baltimore–D.C. area. The phrase "current or then existing" simply recognizes the possibility that new Rustlers might be established or old ones abandoned after execution of the Final Agreement. The only requirement is that there be no disparity in the level of advertising between One–O–One's Rustlers and all other Rustlers in the relevant market. As the district court observed, "[i]f [the parties] intended to say that the level of advertising may not fall below the level being provided on February 4, 1985, when the Agreement was executed, they could have clearly said so." 668 F.Supp. at 702. Because plaintiffs' complaint alleged no disparity in advertising, the district court correctly dismissed the breach of contract claim.

### CONCLUSION

Having corrected the district court's misstep with respect to the existence of a security, we affirm that court's dismissal of appellants' securities fraud claim and the properly adjudicated pendent state law claims of fraud and breach of contract. Accordingly, we instruct the district court to dismiss plaintiffs' complaint with prejudice.

*It is so ordered.*