Andrew WHELAN, et al., Appellants,

v.

Tyler ABELL, et al., Appellees.

Nos. 93–7138, 93–7139.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1994.

Decided March 10, 1995.

Rehearings and Suggestions for Rehearing In Banc Denied May 17, 1995.

Loren Kieve, Washington, DC, argued the cause for appellants. With him on the briefs was Lothar A. Kneifel, Washington, DC.

Michael E. Jaffe, Washington, DC, argued the cause for appellee John B. Toomey. With him on the brief were George R. Kucik and Theodore D. Frank, Washington, DC.

William A. Hylton, Jr., Baltimore, MD, argued the cause and filed the brief for appellee Estate of Anthony G. Chase.

Before: WALD, WILLIAMS and ROGERS, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

Appellants, who are plaintiffs in this action and were defendants in related prior litigation, challenge rulings in which the district court held as a matter of law that their claims of malicious prosecution, abuse of process, and tortious interference with prospective business advantage are barred by the *Noerr–Pennington* doctrine. See *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 132 n. 6, 81 S.Ct. 523, 526 n. 6, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Because we find that neither *Noerr–Pennington* nor the First Amendment protects the conduct plaintiffs have alleged—namely, knowing misrepresentations to state securities administrators and a federal court—we reverse these rulings. Appellants also challenge the district court's decision on remand to set aside an entry of default against one of the appellees. We affirm the district court's decision to set aside the default on most of the claims for "good cause shown", but vacate that decision as to the claim of tortious interference.

\* \* \*

This case comes to us on appeal for the second time, and a full statement of the background is provided in the opinion deciding the first appeal. See *Whelan v. Abell*, 953 F.2d 663 (D.C.Cir.1992) (*"Whelan I"*). We confine ourselves here to facts relevant to this appeal.

Plaintiffs, Andrew J. and Edward T. Whelan, were officers and shareholders of the now-defunct Animated Playhouses Corporation ("APC" or the "company"), a corporation they set up in 1981 in order to create and hold a nationwide chain of "Captain Andy's River Towne" family restaurants, featuring shows by three-dimensional animated characters. Two of the three defendants, Tyler Abell and Anthony Chase (since deceased, now represented by the Chase Estate), invested in the venture in 1982 by buying the company's first restaurant, located in the Putty Hill Plaza in Baltimore County, Maryland, and entering into agreements relating to the use of APC's animations. A few months later the third defendant, James Toomey, purchased a one-third interest from Abell and Chase. Soon after making the investment the defendants lost faith in its prospects. Relations between them and the Whelans soured.

In 1984 defendants fired the first salvo of an extended legal battle, filing a letter of complaint with the Maryland Division of Securities ("MDS") and a lawsuit in federal district court (the "Putty Hill lawsuit"). In both actions, Abell, Chase, and Toomey asserted that various misrepresentations had been made to them in the course of negotiating the Putty Hill transaction. The letter accused APC of having violated the Maryland Franchise Registration and Disclosure Act, while the lawsuit accused the Whelans, APC, and others of having committed mail, wire, and securities fraud, racketeering, and franchise law violations.

The letter of complaint inspired the Maryland Securities Commissioner to issue an order to show cause against Andrew Whelan. In late 1984, Andrew signed a one-year undertaking with the Commissioner (vacated in 1985 in accordance with its terms), in which he asserted that he had complied with the law as he understood it from counsel but agreed to notify the Commissioner in advance of any offers of sales of franchises he intended to make, and to make any such offers in compliance with Maryland law. For a short time, the Putty Hill lawsuit marched on. In due course, however, the district court dismissed all of the claims with prejudice (including counterclaims by the Whelans). Thus, by 1986 both of the actions against the Whelans had concluded, and

Abell, Chase, and Toomey had come up empty-handed.

Meanwhile, the Whelans' company, having failed to obtain crucial financing, fell into bankruptcy; in early 1987 they launched their counter-offensive. Returning to federal district court, they accused Abell, Chase, and Toomey of having completely fabricated the charges in the 1984 letter to MDS and the Putty Hill lawsuit and of having then publicized the frivolous charges to APC's investors, all in a calculated effort to coerce appellants to alter the terms of the original Putty Hill investment agreement. This effort, they argued, constituted a bad faith use of legal processes and directly caused harm to the Whelans' investments in APC and in other ventures. The Whelans sought damages under the common law torts of malicious prosecution, abuse of process, wrongful involvement in litigation, breach of fiduciary duty, and tortious interference with prospective business advantage.

The Chase Estate failed to file any answer to the complaint, and an order of default was entered against it on all counts.

The litigation continued against Abell and Toomey. The district court granted the two defendants summary judgment on the abuse of process and malicious prosecution claims, based on its view of the scope of those common law torts. Only the claims for tortious interference and breach of fiduciary duty went to a jury, which found Abell and Toomey liable to Andrew Whelan but not to Edward. The district court, however, granted the defendants' motion for judgment notwithstanding the verdict against Andrew, again based on the court's understanding of the necessary elements of the torts in question. The Whelans' victory against the Chase Estate, seemingly assured by the earlier entry of default, also slipped out of their hands: On January 18, 1990, the court vacated the order of default and dismissed the charges against the Estate in light of the Whelans' failure to establish their claims against the other defendants.

On appeal the Whelans secured reversal of many of the trial court's adverse rulings. Although affirming the j.n.o.v. on breach of fiduciary duty, we reversed the summary judgment orders on abuse of process and malicious prosecution, the j.n.o.v. on tortious interference, and the decision to set aside the default against the Chase Estate. We then remanded the case, noting that alternative arguments supporting these decisions had been raised but not addressed below. See *Whelan I.* On remand, the district court once again decided in favor of defendants. First it set aside the default against the Chase Estate. *Whelan v. Abell,* Nos. 87–0442, 87–1763, 1993 WL 141073 (D.D.C. Apr. 21, 1993). Then it granted judgment as a matter of law in favor of defendants on the tortious interference claim (thus overturning the verdict in favor of Andrew Whelan) and granted summary judgment against both plaintiffs on the remaining claims, all on the basis of the *Noerr–Pennington* defense. *Whelan v. Abell,* 827 F.Supp. 801 (D.D.C. 1993).

## I. The *Noerr–Pennington* Defense

### A. Rule 50(b)

Before considering the merits of defendants' *Noerr–Pennington* defense, we turn to a purported procedural error in Andrew Whelan's tortious interference trial. We address this first because it might require us to reverse the court's grant of judgment as a matter of law on this claim regardless of the defense's merits.

■ Andrew Whelan maintains that defendants failed to assert *Noerr–Pennington* as a ground for their motion for a directed verdict and that this failure constitutes a waiver of that ground as the basis for j.n.o.v. Thus, he says, it was error for the district court to rely on that ground to grant the motion for j.n.o.v.; and it is our duty, regardless of the merits of defendants' *Noerr–Pennington* theory, to set aside the court's judgment and reinstate his jury verdict.[1] While seeming to

---

1. We note that the 1991 amendments to the rules merged the traditional terms "directed verdict" and "j.n.o.v." into a single term, "judgment as a matter of law"; thus, a motion for "directed verdict" is now called a "motion for judgment as a matter of law" and a motion for j.n.o.v. is now called a "renewal" of the first motion. See Fed. R.Civ.P. 50(a), (b).

acknowledge that he in turn did not file a timely objection to the defendants' expansion of the grounds of their pre-verdict motion, Whelan argues that the rule limiting the judgment n.o.v. is jurisdictional, so that we must enforce it even in the absence of objection.

■ To give our bottom line at the outset: We agree with Andrew Whelan that the defendants failed to raise *Noerr–Pennington* in their pre-verdict motion. And, as Rule 50(b) limits a post-verdict motion for judgment as a matter of law to a "renewal" of the pre-verdict motion, we agree that defendants thereby waived that theory as a basis for judgment as a matter of law. But when defendants renewed the motion after verdict and added the *Noerr–Pennington* theory, Andrew Whelan failed to assert the violation of Rule 50(b), and thus he, in turn, waived that objection. Finally, Whelan's waiver was valid; the limitation in Rule 50(b) is waivable.

Rule 50(a)(2), which governs the pre-verdict motion for judgment as a matter of law, requires the motion to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Rule 50(b) states that when the judge either denies or does not initially grant such a motion, the case is deemed submitted to the jury subject to the judge's later determination of the legal issues raised in the motion. The motion "may be renewed" later, under Rule 50(b). We have understood this to mean, and it seems indisputable, that "[t]he precise claim made in the motion for judgment n.o.v. must have been made in the motion for directed verdict." *U.S. Indus., Inc. v. Blake Constr. Co.*, 671 F.2d 539, 548 (D.C.Cir.1982); accord Fed.R.Civ.P. 50 advisory committee's note to 1991 Amendment (remarking that new language explicitly requiring specificity in Rule 50 motions works to "alter[ ] the result" in cases where a court, by allowing less specificity, effectively circumvented the requirement that the later motion be based on grounds raised in the earlier motion).

■ Defendants' motion for directed verdict argued that plaintiffs had failed to prove "an unprivileged, improper, intentional interference with [a business] expectancy". The only reference that could conceivably allude to the *Noerr–Pennington* doctrine is the word "unprivileged". Defendants suggest that this somehow echoed their arguments in the trial that *Noerr–Pennington* created some form of evidentiary privilege, but any such echo is far too faint. While of course context is important, trial courts and opposing counsel cannot be expected to impute to the movants every meaning that might be grounded on such a remote foreshadowing. Cf. *Perdoni Bros. v. Concrete Sys., Inc.*, 35 F.3d 1, 3 (1st Cir.1994). Thus, had Andrew Whelan opposed the post-verdict motion by arguing that the earlier one did not specify the *Noerr–Pennington* defense, it would have been reversible error for the district court to grant the motion on that defense. See *Blake*, 671 F.2d at 548.

Andrew Whelan did not, however, object to this procedural defect at that time. Rather, he raised the issue for the first time in his July 9, 1993 motion to alter or amend the judgment under Fed.R.Civ.P. 59(e). Defendants now claim that by failing to object to the procedural defect prior to the entry of judgment, Andrew Whelan waived his right to raise it.

Whelan does not contest the general proposition that issues not raised before judgment in the district court are usually considered to have been waived on appeal. See *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C.Cir.1993) (noting that "a losing party may not use a Rule 59 motion to raise new issues that could have been raised" before the adverse judgment, and that appellate court will not ordinarily address issues not timely raised below); *Seamon v. Vaughan*, 921 F.2d 1217, 1220 (11th Cir.1991) (refusing to entertain on appeal argument not presented to the district court until after final judgment). He argues, rather, that Rule 50(b)'s limitation of the post-verdict judgment as a matter of law to renewal of a pre-verdict motion is jurisdictional, because it is rooted in the Seventh Amendment prohibition against judicial reexamination of facts tried by a jury. Thus, he contends, it may be raised at any time.

■ We agree that the limitation arises from historic jury practices and are ready to assume that it is of constitutional weight. But because the limitation historically served only to protect the right to trial by jury, we find it as waivable as that right itself.

The contention that the limitation is unwaivable appears to be based on the theory that the Seventh Amendment's prohibition against courts "re-examin[ing]" facts found by the jury is designed to protect the institution of the jury per se as well as (and independently of) the parties' concrete right to a jury trial. Dicta in some cases may be read as supporting this theory. In *Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.,* 583 F.2d 565, 569 (1st Cir.1978), for instance, the court noted—in addition to the practical point that Rule 50(b)'s requirement enables the opponent of the motion to plug any holes in his evidence—that the requirement ensures "that the judge may rule on the adequacy of the evidence without impinging on the jury's fact-finding province."

But a look at the history of the bar on re-examination demonstrates the error of this view. In *Slocum v. New York Life Ins. Co.,* 228 U.S. 364, 375–400, 33 S.Ct. 523, 527–37, 57 L.Ed. 879 (1913), the Court found that under the common law a verdict, once rendered, could not be set aside as unsupported by the evidence even if a motion for a directed verdict based on the insufficiency of the evidence would have been properly granted. The trial court (or an appellate court) could order a new trial, but for the court to enter judgment against the verdict would improperly encroach on the verdict winner's constitutional right. Later, in *Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636 (1935), the Court endorsed the practice now embodied in Rule 50(b), whereby the submission of the case to the jury is provisional, and the pre-verdict motion is subject to renewal and grant after verdict. To grant the motion on an entirely new ground would obviously nullify this restriction of the post-verdict motion. And, since the Court's acceptance of the post-verdict motion's constitutionality rested on this restriction, such a grant would impinge on the verdict winner's Seventh Amendment right.

But even in *Slocum,* the high-water mark of Supreme Court insistence on the niceties of post-verdict practice, the Court plainly saw the restriction on the post-verdict motion as simply an aspect of the party's rights, and thus waivable:

> [I]t is the province of the jury to hear the evidence and by their verdict to settle the issues of fact.... [T]he court cannot dispense with a verdict, or disregard one when given, and itself pass on the issues of fact. In other words, the constitutional guaranty operates to require that the issues be settled by the verdict of a jury, *unless the right thereto be waived.*

228 U.S. at 387–88, 33 S.Ct. at 532 (emphasis added). Further, in *Slocum* the Court relied on and quoted copiously from *Hodges v. Easton,* 106 U.S. 408, 1 S.Ct. 307, 27 L.Ed. 169 (1882), which bristles with allusions to waiver:

> [W]e then have a case at law, which the jury were sworn to try, determined, as to certain material facts, by the court alone, *without a waiver of jury trial as to such facts.* It was the province of the jury to pass upon the issues of fact, *and the right of the defendants to have this done was secured by the Constitution of the United States. They might have waived that right,* but it could not be taken away by the court.... The court could not, consistently with the constitutional right of trial by jury, submit a part of the facts to the jury, and, itself, determine the remainder *without a waiver by the defendants of a verdict by the jury.*

106 U.S. at 412, 1 S.Ct. at 310 (emphasis added), quoted in *Slocum,* 228 U.S. at 385, 33 S.Ct. at 531.

Thus Rule 50(b)'s insistence that the post-verdict motion be only a *renewal* of the earlier one is simply an aspect of each party's right to jury trial. Just as a party may waive that right on all of the issues by failing to demand a jury trial at the outset, see Fed.R.Civ.P. 38(d), so it may waive its right to the procedural refinements of Rule 50(b).

■ Because the right to a jury trial is fundamental, "every reasonable presumption should be indulged against its waiver." *Hodges v. Easton,* 106 U.S. at 412, 1 S.Ct. at 310. Indeed, the requirement of a pre-submission motion setting forth the specific grounds is designed to ensure that a party not inadvertently waive his right to a jury verdict by failing to submit adequate evidence on the issues in contention. See Fed. R.Civ.P. 50(a), advisory committee note to 1991 Amendment ("In no event ... should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact.").

■ In this case, however, the presumption against waiver is not adequate to preserve Whelan's procedural challenge. If Andrew Whelan was, as he claims, caught off guard by defendants' post-verdict motion on the *Noerr–Pennington* defense because of its absence from the pre-submission motion, he had an obvious opportunity to protest: in his papers opposing the post-verdict motion. By failing to complain at the obvious time, before the court ruled against him, Whelan waived his procedural objection. See 5A *Moore's Federal Practice* ¶ 50.04 (2d ed. 1994) ("[I]f judgment as a matter of law is granted, the losing party may not object on appeal to the lack of an articulated basis for the motion unless the party also raised that objection in the trial court."); *Collins v. Illinois,* 830 F.2d 692 (7th Cir.1987) (holding, without discussion of Seventh Amendment, that after judgment has issued defendant may not raise an argument that plaintiff did not "properly comply with the procedural prerequisites" of Rule 50(b)).

B. Merits of the *Noerr–Pennington* Defense

Accordingly, we now reach the merits of the *Noerr–Pennington* theory. The district court adopted the theory in its decision upsetting the jury verdict for Andrew Whelan on his claim of tortious interference with prospective business advantage. In granting defendants' motion for judgment as a matter of law on this claim, however, the court also noted, by the way, that its conclusion also called for summary judgment for the defendants on the malicious prosecution and abuse of process claims. The Whelans—including Edward, for he must overcome defendants' *Noerr–Pennington* theory if the summary judgments against him are to be reversed—have appealed all three of these rulings, arguing that the court misapplied the *Noerr–Pennington* doctrine in each case.

The court read the *Noerr* and *Pennington* cases to mean that "a person cannot be held liable as a result of his or her filing a good-faith lawsuit or administrative claim or otherwise seeking governmental redress." *Whelan v. Abell,* 827 F.Supp. at 803. It then went on to inquire whether defendants' filings fit into the "sham exception" to the *Noerr–Pennington* doctrine, under which otherwise protected conduct loses its protection if it both (1) is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits", *Professional Real Estate Investors v. Columbia Pictures,* —— U.S. ——, ——, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993) (*"PREI"*), and (2) fails to satisfy a subjective test that the *PREI* Court framed entirely in terms of the antitrust litigation involved in that case. *Whelan v. Abell,* 827 F.Supp. at 803–04. The district court then found that the show cause order of the Maryland Division of Securities, and the resulting consent decree, conclusively established that the defendants' filings were not "objectively baseless". *Id.* at 804.

The Whelans contest this holding on two grounds. First, they argue that the *Noerr–Pennington* doctrine simply does not apply to state common law torts, which lie far outside of the federal antitrust context in which the doctrine was formed. Second, they say that, even if the doctrine would ordinarily apply in this context, defendants' petitions to the Maryland and federal authorities are not protected petitioning activity because their core consisted of deliberately false representations, which are entitled to no protection under *Noerr–Pennington.*

■ We resolve the case without attempting to set forth any kind of encyclopedic position on the relation between the common law torts at issue here and the *Noerr–Pen-*

*nington* doctrine—or between them and the First Amendment regardless of the idiosyncracies of *Noerr–Pennington.* Assuming that *Noerr–Pennington* or the First Amendment reaches such torts in some sense, we see no constitutional problem where plaintiffs, as in the tortious interference trial, have shouldered the burden of showing that the defendants' petitions were deliberately false. Moreover, the district court erred in thinking that the MDS consent decree precluded the Whelans from proving such deliberate falsity.

Plaintiffs' argument that *Noerr–Pennington* is no more than a method of construing the Sherman Act has some support in the cases. The *Noerr* Court itself claimed that because the outcome was determined entirely by "the view we take of the proper construction of the Sherman Act," it was "unnecessary to consider" the defense that the "activities complained of were constitutionally protected under the First Amendment". *Noerr,* 365 U.S. at 132 n. 6, 81 S.Ct. at 526 n. 6; see also *Pennington,* 381 U.S. at 669–70, 85 S.Ct. at 1592–93.

Nevertheless, the *Noerr* Court adopted this method of construction in significant part as a means to avoid finding a conflict between the Sherman Act and the First Amendment right to petition. See *Noerr,* 365 U.S. at 139, 81 S.Ct. at 530 (rejecting construction of Sherman Act "that would disqualify people from taking a public position on matters in which they are financially interested" because it would "deprive the people of their right to petition in the very instances in which that right may be of the most importance to them."). And in *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), where it extended *Noerr–Pennington* to bar the NLRB's attempt to enjoin prosecution of a suit as an unfair labor practice, the Court characterized its decision in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), as having "recognized that the right of access to the courts is an aspect of the First Amendment right to petition...." 461 U.S. at 741, 103 S.Ct. at 2168.

As *Noerr–Pennington* rests on the conclusion that the filing of claims in court or before administrative agencies is part of the protected right to petition, it is hard to see any reason why, as an abstract matter, the common law torts of malicious prosecution and abuse of process might not in some of their applications be found to violate the First Amendment. We know that a state cannot constitutionally impose liability based on proof of libel and slander in their unreconstructed forms, *New York Times v. Sullivan,* 376 U.S. 254, 268–69, 84 S.Ct. 710, 719–20, 11 L.Ed.2d 686 (1964) ("libel can claim no talismanic immunity from constitutional limitations"), so there is nothing inherently sacrosanct about common law torts. Cf. *NAACP v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963) ("a State cannot foreclose the exercise of constitutional rights by mere labels"); *Bridges v. California,* 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941) (dismissing as "dubious" the contention that judicial power of contempt's roots in English common law render exercise of that power immune from constitutional review). Of course, such constitutional limitations would apply as such, without the filter of *Noerr–Pennington,* which the court has so far used only to justify narrow constructions of federal law.

In the most concrete context in which the defendants have asserted *Noerr–Pennington* (the motion for judgment as a matter of law on the tortious interference claim), however, there does not appear to be even a potential for collision between the common law tort and the First Amendment. First, the instructions authorized the jury to find defendants liable to plaintiffs only if it found, in effect, that the defendants filed deliberate falsehoods in attacking plaintiffs before the MDS and in court. We see no reason to believe that the right to petition includes a right to file deliberately false complaints. Second, the court was wrong to treat the Maryland administrative proceeding, or its culminating consent decree, as precluding plaintiffs from showing such willful falsity.

The jury instructions effectively required a finding of deliberate falsity. The judge stated that a person could not be found liable for seeking enforcement of rights he "reasonably believe[s] himself to have, so long as the

claims are not known to him to be false or fraudulent or are filed for an improper purpose."

The reference to "improper purpose" might seem to allow a verdict for plaintiffs based on some vague jury hostility to the defendants' conduct, but the judge went on to cabin the idea of what is "improper". He noted that "a lawsuit is not false or fraudulent or filed for an improper purpose merely because the primary motivation of the person who brings the suit is to induce the other side to settle a dispute." He also said that to find the defendants' actions improper the jury must find "that each defendant had no justification for his participation in those actions". And he defined justification in terms that closely tracked his earlier point that defendants were free to pursue their claims "so long as the claims are not known to him to be false or fraudulent": To find that a defendant was "justified in instituting those legal proceedings," all the jury needed to decide was that he "honestly and reasonably believed that misrepresentations had been made [by the Whelans]." Accordingly, the jury verdict effectively incorporates a finding not only that Abell's and Toomey's claims about the Whelans' misrepresentations—at any rate Andrew's—were false, but also that the defendants did not "honestly and reasonably believe[ ]" that Andrew Whelan had made misrepresentations.[2]

However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods. "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613; see also *PREI,* —— U.S. at —— n. 6, 113 S.Ct. at 1929 n. 6 (quoting the passage). In a decision four years after *Noerr* and months after *Pennington,* the Court said, without discussion of either case, that a firm could not invoke a patent as a defense to antitrust charges if it "obtained the patent by knowingly and willfully misrep-

resenting facts to the Patent Office." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). And we said in *Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 263 (D.C.Cir.1981), "Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr.*" Finally, the court in *Liberty Lake Investments, Inc. v. Magnuson,* 12 F.3d 155 (9th Cir.1993), construed the Supreme Court's note 6 in *PREI* as making *PREI's* two-part "sham" test inapplicable where there was "proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the [prior] litigation of its legitimacy." *Id.,* 12 F.3d at 159.

While the district court may have implicitly recognized that knowing assertion of false claims is not protected by *Noerr–Pennington,* it regarded the Maryland Securities Commissioner's order to show cause against and undertaking with Andrew Whelan as precluding plaintiffs from showing such deliberate falsity:

> Given the independent investigation and disposition in the administrative proceeding in Maryland, it is clear that Abell's letter to the MSC [Maryland Securities Commissioner] was not "objectively baseless". By any standard, the MSC letter would be protected under Noerr–Pennington and cannot provide a basis for Plaintiffs' ... claims.

*Whelan v. Abell,* 827 F.Supp. at 804. This was error.

■ Maryland's issuance of an order to show cause plainly cannot bar plaintiffs from showing the fraudulent character of the underlying letter by defendants. Collateral estoppel applies only to preclude litigation of issues "actually and necessarily determined"

---

2. Use of the conjunctive in the phrase "honestly and reasonably" conceivably might raise a question of whether the jury might have found the defendants' behavior dishonest but reasonable, or unreasonable but honest. Whatever signifi-
cance such refinements might have for application of conceivable First Amendment constraints on the claim of tortious interference, defendants have not raised such issues below or here.

by an earlier adjudication. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *I.A.M. Nat'l Pension Fund v. Industrial Gear Mfg. Co.,* 723 F.2d 944, 949 (D.C.Cir.1983). The Maryland authorities may not have been required to make any finding of probable cause as a basis for issuing the order, and thus the question they resolved may differ substantially from that involved in this litigation. See *Commissioner v. Sunnen,* 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948) (collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding"). Further, even assuming that the Maryland authorities conducted an "independent investigation" (which is sharply contested) and found probable cause to issue the order, there is no indication that before its issuance plaintiffs had any opportunity to contest defendants' contentions, much less a "full and fair opportunity to argue their version of the facts", *United States v. Utah Construction Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), which is the necessary predicate of issue preclusion. See *Nasem v. Brown,* 595 F.2d 801, 806 (D.C.Cir.1979) ("The advantages of finality ... can only be fairly garnered when the party to be estopped has had an adequate opportunity to litigate his claims. Without such an opportunity, lack of faith in the reliability of the first proceeding precludes application of the collateral estoppel doctrine."); cf. *Westreich v. McFarland,* 429 F.2d 947, 949 (4th Cir.1970) (noting that while "a majority of the states hold that an indictment is prima facie or presumptive evidence that probable cause existed for the prosecution", the plaintiff in a malicious prosecution action has the right "to bring forth evidence that the defendant obtained the indictment by fraudulently misrepresenting or withholding material facts.").

 Nor does the undertaking bar Andrew Whelan from showing that defendants' assertions were deliberate lies. Andrew Whelan did not admit having committed any of the violations the defendants alleged, much less agree to have the factual basis of those allegations treated as true in future litigation. Unless a consent decree "clearly manifests the parties' intent to be bound [by a stipulated fact] in future actions", "that fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." *Otherson v. Department of Justice, I.N.S.,* 711 F.2d 267, 274 & n. 6 (D.C.Cir.1983). Even a fully litigated judgment can be set aside on grounds of fraud, at least by making a suitable motion in the original forum. See Fed.R.Civ.P. 60(b)(3) (providing for relief from judgment based on "fraud ..., misrepresentation, or other misconduct of an adverse party"). It defies comprehension that the defendants should be exonerated as a matter of law as a result of a settlement between the Maryland Securities Commissioner and Andrew Whelan in which Whelan conceded no wrongdoing and suffered no penalty.[3] As we recognized in *Otherson,* preclusion does not apply to issues not litigated, because a difference in the stakes may explain the party's failure to litigate such issues in the first action. *Otherson,* 711 F.2d at 275.

Accordingly we must reverse the judgment as a matter of law entered despite the jury verdict for Andrew Whelan. Defendants argue that reversal of that judgment requires a new trial, rather than reinstatement of the jury's verdict. They cite this court's opinion from the previous appeal, *Whelan I,* "953 F.2d at 663, 668–69", as well as the district court's statement that "Consistent with the Court of Appeals' decision, if Defendants' motion were to be denied, the jury verdict would not be reinstated, but a second trial would be required...." *Whelan v. Abell,* 827 F.Supp. at 802. We have scoured the cited pages of our prior opinion without discovering a ghost of a hint why reversal of the judgment should lead to a new trial rather than to reinstatement of the verdict. Nor can we find a basis for the quoted passage from the district court's decision. Accordingly, we order the court to enter judgment

---

**3.** Even if the MDS undertaking had any preclusive effect against Andrew Whelan as to claims made by defendants in that proceeding, it would have none as to Edward or as to the distinctively different claims made in the Putty Hill lawsuit.

on the verdict, subject of course to such motions as have not been waived.

■ There remain the Whelans' claims of malicious prosecution and abuse of process, against which the district court granted summary judgment, again in reliance on the MDS proceeding. That judgment plainly must be reversed. As to them, however, there is no verdict to reinstate. Indeed, the parties have not even closely briefed the issue of just what a plaintiff must show under either theory, and the scope of these torts under District law is not altogether clear. Cf. *Whelan I*, 953 F.2d at 670 (observing that malicious prosecution, but not abuse of process, requires a showing of want of probable cause).

To the extent that the torts require plaintiffs to establish to a jury's satisfaction that defendants' assertions in the MDS proceeding and the Putty Hill lawsuit were knowingly false (as Andrew Whelan already has), they would certainly not conflict with the First Amendment or *Noerr–Pennington.* Some formulations of these torts, nevertheless, could raise such issues. The Restatement definition of the tort of abuse of process, for example, appears quite sweeping:

§ 682. General Principle

One who uses a legal process, whether criminal or civil, against another primarily to *accomplish a purpose for which it is not designed,* is subject to liability to the other for harm caused by the abuse of process.

Restatement 2d Torts § 682 (1977) (emphasis added). This definition, without further limitation, could lead to liability based on very loose grounds, as where a jury merely finds the defendant driven by a desire for revenge. Compare, e.g., *Powers v. Leno,* 24 Mass.App. 381, 509 N.E.2d 46 (1987) (abuse of process claim made out by allegations that defendant pursued litigation to deny neighbor a building permit in order to coerce gratis transfer of land to himself; evidence of defendant's "bad intentions" may suffice if they show that defendant "was using [legal process] as a form of extortion" to obtain a "collateral advantage"), with *Bown v. Hamilton,* 601 A.2d 1074 (D.C.App.1992) (holding that abuse of process claim cannot rest solely on allegation that landlord sought tenant's eviction to

achieve ulterior purpose of depriving tenant of right to exercise option for additional space), and *Morowitz v. Marvel,* 423 A.2d 196, 198 (D.C.App.1980) (noting that proof of "ulterior motive" does not suffice to prove abuse of process under District law, the "critical concern" being "whether process was used to accomplish an end unintended by law, and whether the suit was instituted to achieve a result not regularly or legally obtainable."); *id.* at 197–98 ("In an effort to avoid infringing upon the right of the public to utilize our courts, we are cautious not to adopt rules which will have a chilling and inhibitory effect on would-be litigants of justiciable issues.").

We think it inappropriate for us to address the possible First Amendment conflict before the district court has determined the essential ingredients of the torts, lest we unnecessarily anticipate a constitutional issue or resolve it more broadly than necessary. See *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). We note that the process of ascertaining the scope of these torts under District law may give the court the special problem of deciding, in the event that District precedent appears to clash with the First Amendment right underlying *Noerr–Pennington,* whether to certify to the D.C. Court of Appeals, pursuant to D.C.Code § 11–723 (1981), the construction of the tort in light of the potential First Amendment conflict, see *Government and Civic Employees Organizing Comm., CIO v. Windsor,* 353 U.S. 364, 366, 77 S.Ct. 838, 839, 1 L.Ed.2d 894 (1957), or to adjust the tort by adding an element so as to assure accommodation of the First Amendment, just as the Supreme Court in effect added the element of actual malice to certain types of defamation in *New York Times v. Sullivan.* On this issue compare *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971), explaining that a federal court *cannot* save a state statute because it cannot give it an authoritative limiting construction, with *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 500, 105 S.Ct. 2794, 2800, 86 L.Ed.2d 394 (1985), which in fact does precisely that.

Accordingly, we reverse the summary judgment orders on plaintiffs' abuse of process and malicious prosecution claims and remand the case for further proceedings consistent with this opinion.

■ Before leaving this subject, we note briefly that plaintiffs have asserted a rather broad reading of our decision in *One–O–One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C.Cir.1988). We there read a contract's integration clause (the agreement "supersede[d] any and all previous understandings and agreements") to bar certain fraud claims. But two of the three alleged frauds rested on alleged oral promises as to future behavior, not included in the final, written contract, see 848 F.2d at 1286, and thus appeared clearly barred by the integration clause. The third, alleged concealment of some negotiations, *id.*, provided a thin basis for any claim of fraud in the inducement, since the negotiations were at worst in violation of the first two alleged promises, which we held to have been excluded from the final contract. Accordingly, our conclusion in that case was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally or confines them to claims of fraud in execution. Cf. *id.* at 1287 (allusion to signatures obtained by trick or artifice). Such a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate. See *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402, 407 (3d Cir.1981); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.4 (1990) ("To the extent that evidence of misrepresentation is admissible even if the agreement is completely integrated, it is admissible in the face of the usual merger clause, since such a clause shows no more than that the contract is completely integrated."). Thus the integration clause in the parties' agreement here does not, as the Whelans suggest, establish that all of defendants' claims of fraud in the inducement were false as a matter of law.

## II. Entry of Default

■ The final ruling the Whelans contest is the court's decision to vacate the default orders against the Chase Estate pursuant to Federal Rule of Civil Procedure 55(c), which allows an entry of default to be set aside upon a showing of "good cause". We review this decision for abuse of discretion, keeping in mind the federal policy favoring trial over default judgment. See *Jackson v. Beech*, 636 F.2d 831, 835 (D.C.Cir.1980) (noting standard of review); *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C.Cir. 1980) ("modern federal procedure favor[s] trials on the merits"). Despite these constraints, we vacate the court's order and reinstate the entry of default on the tortious interference claim, finding the decision to set aside the default on this claim an abuse of discretion. We affirm as to the other counts, though. While we have some doubts about the basis of the court's judgment in setting aside the entry of default on those counts, our doubts there are not strong enough to overcome the deferential standard of review and the general federal policy against default judgment.

The Whelans filed their initial complaint on February 20, 1987. The Estate did not file an answer to the complaint; instead, on March 13 (within the time limit for answers imposed by Rule 12(a)), it sent a letter to plaintiffs' counsel stating its belief that the action was barred by a Florida statute of limitations. On April 9, the court clerk entered default against the Estate. On May 6, plaintiffs' counsel wrote to the Estate, notifying it of the entry of default and asking the Estate, in turn, to notify relevant third parties. Not until August 16, 1988—eighteen months after the complaint was filed—did the Estate make an appearance in court. On that date, the Estate asked the court to set aside the default. Finding that the motion was "egregiously untimely without explanation", that the defense proffered—the Florida statute of limitations—was "of doubtful merit", and that a set-aside of the default would be prejudicial to plaintiffs, the court denied the motion.

Several months later, however, the court set aside the default. The court explained that its rulings in favor of the Estate's codefendants required it to do so, "it appearing from the entire record that the complaints fail to state meritorious claims." When the

Whelans appealed, we vacated this decision as based on an erroneous view of the law. We noted, however, that on remand the district court would be "free to consider whether to vacate the default orders" pursuant to Federal Rule 55(c)'s provision for setting aside entry of default "[f]or good cause". *Whelan I*, 953 F.2d at 675.

After reviewing the elements said by *Jackson v. Beech* to control the setting aside of a default, see 636 F.2d at 832 (the court must assess whether the default is willful, whether the defendant has presented a meritorious defense, and whether the plaintiff would suffer substantial prejudice by a decision to set aside the default), the district court found "good cause" to set aside the default.

The court first found that the Estate's failure to respond substantively to the complaint did not "rise to the level of wilfulness required ... to deny the Estate's motion to set aside the default", relying on the Estate's March 13, 1987 letter asserting the statute of limitations defense. It appeared to have little basis for this conclusion other than the Estate's conclusory assertion that it had acted in good faith—that is, that it had not intended to disrupt or delay the proceedings. But the Estate has proffered no excuse for its failure to file an answer, and it has neither clarified whether its letter is to be treated as an answer for purpose of the waiver provisions of Rule 12(h) nor explained why it waited 16 months after the default was entered before asking that it be set aside. Absent some explanation such as monumental incompetence, the record suggests intentional delay.

On the question of a possibly meritorious defense, the court remarked without greater specificity that the Estate had asserted various defenses. In fact, the Estate just adopted by reference the defenses of its co-defendants, including the *Noerr–Pennington* defense we have addressed in this opinion. The court did not explicitly rule on the plausibility of these defenses; instead, it simply stated, "If Plaintiffs believe any defenses asserted are indeed meritless, Plaintiffs can file an appropriate motion at the appropriate time." We understand this to mean that the court found those defenses asserted sufficiently plausible to support the motion. We note that the movant is not required to prove a defense, but only to assert a defense that it may prove at trial. Because the plaintiffs' claims against the Estate appear to be based on substantially the same facts and law as their claims against the Estate's co-defendants, we find no clear error in the district court's decision to credit the Estate as having asserted meritorious defenses.

Finally, the court addressed the last of the three considerations—the prejudice to plaintiffs from setting aside the entry of default. It is on this issue that our judgment differs most substantially from the district court's. The court found that the Whelans would suffer at most "minimal" prejudice were the default set aside. The court noted that the litigation had proceeded apace without the Chase Estate, citing *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder L.*, 432 F.2d 689, 691 (D.C.Cir.1970) (noting that "the default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."), and that the Estate was requesting no opportunity for discovery, apparently being ready to rely on that of its co-defendants. This analysis is not unreasonable as to most of the claims. But the court appears to have ignored the fact that plaintiffs had completed a trial against the two co-defendants on the tortious interference claim. Whether it assumed that the jury verdict in that trial would ultimately be set aside based on a defense applicable to all three defendants or simply disregarded the burden on plaintiffs of having to redo the trial in order to establish the tortious interference claim against the Estate, it clearly erred in finding that setting aside the default would not substantially prejudice plaintiffs on this claim.

In sum, while there is some possibility that the Estate's defenses will prove adequate, the Estate's unexplained delay in responding to plaintiffs' complaint renders the balance of the equities on the issue of default far more precarious than the district court's opinion suggests. If the Estate is permitted to re-enter the case without limitation, plaintiffs will have to try their tortious interference claim a second time. This substantial preju-

dice tips the balance on that claim so far in plaintiffs' favor that we are constrained to find an abuse of discretion in the court's decision to set aside the default on that claim, and we vacate the order to that extent. As to the other claims, we see no abuse of discretion in the court's finding that plaintiffs would suffer only minimal prejudice from a set-aside of the default, and we affirm its set-aside order.

\* \* \*

Thus, we hold that the district court erred in finding the Whelans' claims of malicious prosecution, abuse of process, and tortious interference barred as a matter of law under the *Noerr–Pennington* doctrine. Plaintiffs have alleged that defendants based their petitions to the MDS and the federal court on factual statements defendants knew were false. Insofar as such deliberately false statements are the basis for defendants' liability under the torts alleged, neither the First Amendment nor the *Noerr–Pennington* doctrine bars plaintiffs' recovery.

Subject to any objections that defendants have preserved, we remand the case for the court to enter judgment against Abell and Toomey on Andrew Whelan's tortious interference claim and for a new trial against all three defendants on the Whelans' remaining claims of malicious prosecution and abuse of process. So long as the reinstated tortious interference verdict is not set aside, the court should enter judgment on that claim against the Chase Estate in favor of both Andrew and Edward Whelan. See *Whelan I*, 953 F.2d at 675 ("Chase's liability in this case is not so intertwined with Abell's and Toomey's that consistent findings against each of them are necessary.") (citing *Carter v. District of Columbia*, 795 F.2d 116, 137–38 (D.C.Cir. 1986)).

*So ordered.*