**In re ESTATE OF Geraldine B. McKENNEY; Khalid M. Eltayeb, Appellant.**

**No. 05–PR–1271.**

District of Columbia Court of Appeals.

Argued Feb. 6, 2008.

Decided July 24, 2008.

---

Frederick A. Douglas with whom Robert Dillard was on the brief, for appellant Khalid M. Eltayeb.

Gary M. Sidell for appellant Joseph W. McKenney, Jr.

C. Hope Brown for appellee Estate of Geraldine B. McKenney.

Before GLICKMAN and FISHER, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

In the fall of 2004, Joseph McKenney, Jr., sold his property rights in his deceased mother's estate to Khalid B.M. Eltayeb for $1,200. The principal asset was the mother's home, on which this appeal focuses. Subsequently, after a hearing, the probate court voided the sale and removed Eltayeb as the personal representative of the mother's estate. On appeal with new counsel, Eltayeb challenges these actions by the trial court. We affirm.

## I.

### Background

Geraldine B. McKenney died intestate on November 14, 1990, leaving as her only significant asset her home at 1525 E Street, S.E. Her son, Joseph W. McKenney, Jr., was her sole heir. No probate proceedings were instituted at that time.[1] For more than a decade, the property taxes on the home went unpaid and the amount of unpaid taxes accrued to over $100,000.

In November 2004, Eltayeb approached McKenney at his place of employment.

---

1. Under D.C. law since 1980, legal title to realty as well as personalty passes to the personal representative and not, as at common law, to the intestate heirs. D.C.Code § 20–105 (2001). *See Douglas v. Lyles,* 841 A.2d 1, 3 (D.C.2004).

McKenney was a banquet steward who had no experience at all in real estate matters and who lived in a shelter on the grounds of St. Elizabeths Hospital. Eltayeb asked McKenney if he was aware of the $100,000 in outstanding taxes owed and asked whether McKenney "was in any position to do anything with the property." McKenney understood Eltayeb's implication to be that McKenney would need to pay that amount himself and "to pay it at one time." Eltayeb offered to purchase McKenney's interest in the property. McKenney said that he did not know the exact amount of unpaid taxes, but that he thought that he had already lost the home for failing to pay the property taxes. Eltayeb offered McKenney $1,200 for his interest in the property, but he did not disclose the property's value or that there was a right of redemption. He pressed McKenney to make a decision "right away," asserting that the house was facing imminent demolition. Eltayeb introduced McKenney to a man accompanying Eltayeb as a nephew of a prominent local political figure. Eltayeb said that the nephew had the contract for the demolition of the property.

The next day, Eltayeb again met with McKenney at work. Pressed for a decision, McKenney accepted the offer and was paid the first installment of $300. He testified that he felt "pressured into making a quick decision" because Eltayeb claimed that he needed an answer to his offer immediately in order to stop the pending demolition of the property. Over the next three weeks, McKenney received the three remaining $300 installment payments. On at least one occasion, he was again accompanied by the man who supposedly had the contract to demolish the property.

At one point during that period, Eltayeb picked up McKenney at work and they went to meet with Eltayeb's then attorney for "some paperwork." McKenney was presented with an "Irrevocable Assignment of Right" assigning his property interest to Eltayeb. He signed the document although no dollar value was listed in the agreement. Eltayeb's attorney then presented McKenney with pages one, two, and four of a Petition for Probate of his mother's estate. Omitted was page three of the petition as actually filed, which listed the home's value at $150,000 and erroneously stated that McKenney had paid nearly $4,000 in funeral expenses when he had in fact paid none. Moreover, McKenney overheard Eltayeb telling his attorney that the purchase price of property was $1,200. Without being shown the third page, McKenney signed the Petition, which was filed several days later, seeking appointment of Eltayeb as the personal representative.

On December 15, 2004, the trial court held a hearing on the Petition for Probate so that it could "further probe into the circumstance of the transaction." Prior to the hearing, Eltayeb told McKenney not to volunteer too much information and only to answer the questions asked. McKenney testified, but the purchase price of the assignment was never disclosed to the court and the trial judge never inquired, perhaps because the nature of the concerns prompting the hearing was focused elsewhere.[2] At the hearing, Eltayeb's attorney informed the court that he repre-

---

2. The focus of the hearing was whether McKenney was competent to execute the assignment. The Clerk's office mistakenly believed that McKenney, who is fifty-nine years old, was a minor. There was also concern about McKenney's mental competency be- cause the address that he listed in the Petition for Probate matched that of St. Elizabeths Hospital. McKenney testified that he was not a patient, but lived at a shelter on the hospital's grounds.

sented the estate—not Eltayeb—and that they were there to "save the house" from a pending tax sale, although he was retained by Eltayeb and served as his personal attorney. The trial judge accepted the Petition for Probate. Eltayeb was appointed the estate's personal representative and conveyed the property to himself by quitclaim deed the next month, which was recorded on January 15, 2005.

In March 2005, McKenney was approached by a third party, who informed him of the property's real value and offered to purchase the property. McKenney filed a petition to remove Eltayeb as personal representative and to rescind the assignment. He then executed an agreement to sell the property for $205,000 minus the outstanding tax debt.

The trial court conducted several days of evidentiary hearings. McKenney testified to the facts of the transaction and the petition for probate as set forth above. To the contrary, Eltayeb testified that he paid McKenney $48,375 in currency in a similar manner to what McKenney testified, but that he had no receipts, withdrawal records, bank statements, or any other documents confirming the transaction or the source of the funds. Instead, he produced a torn scrap of paper that he purported to contain his notes regarding the payments. When Eltayeb added the amounts of the five alleged installment payments before the court, the sum was $46,400, which was less than the total amount he claimed that he paid McKenney. Eltayeb denied telling McKenney that the man accompanying him had a contract to demolish the home.

Another issue at the hearing was the location of Eltayeb's residence. The address he listed in the Petition for Probate was that of his attorney. Before the trial court, Eltayeb testified that he was a resident of the District of Columbia, even though his vehicle had Virginia "drive-away" license plates, which he claimed were issued for his car detailing business that was located at a friend's home in Alexandria, Virginia, and his cellular telephone number's area code was 703, which is designated for Northern Virginia. He claimed that his residence was 333 I Street, Southwest; however, the electric utility bill for this home, which is air-conditioned, showed zero kilowatt hours billed from December 2003 until October 2004. Furthermore, Eltayeb was unable to produce his driver's license and stated that he is not a registered voter. At the conclusion of the hearings, the trial court found by clear and convincing evidence that Eltayeb made "substantial fraudulent untrue misrepresentations or representations to Mr. McKenney for the purpose of inducing him to execute the irrevocable assignment of his rights in this case, and Mr. McKenney relied upon these misrepresentations...." The court completely discredited Eltayeb's testimony:

> Now for somebody to come into this court and represent that they paid out $48,375 based on this scrap piece of paper is almost an insult to the intelligence of the Court and constitutes a blatant lie. A blatant. Not only a lie but a blatant lie.

The court explained that Eltayeb's lack of any documentation to substantiate the payment "strains reason to the breaking point—beyond the breaking point" and was a "complete fabrication." The trial court concluded that Eltayeb's misrepresentations were deliberate and that he and his attorney intentionally tried to make the Petition for Probate look as "benign" as possible so that it would be quickly approved without question. The court then removed Eltayeb as personal representative, and voided both the assignment and quitclaim deed.

## II.

### Jurisdiction of the Trial Court

◼ On appeal, Eltayeb first alleges that the trial court lacked jurisdiction to consider McKenney's Petition to Vacate, which was filed five months after the Petition for Probate was signed. He claims that McKenney's motion was untimely because Super. Ct. Prob. R. 130 requires that all motions for reconsideration be filed within thirty days of the ruling contested. However, Eltayeb's characterization of the Petition to Vacate as a motion for reconsideration is incorrect because the trial court never ruled on the validity of the assignment during the initial hearing. The focus of the hearing was McKenney's age and competency. See note 2, *supra.* The fact that the trial court never inquired into the most important part of the assignment—the price paid—is evidence that the assignment's validity was never considered at the hearing. Because no judgment on the assignment was issued, there was no order that could be reconsidered and "[a]n interested person ... may, *at any time,* petition the Court for an order ... to resolve a question or controversy arising in the course of a supervised or unsupervised administration of a decedent's estate." D.C.Code § 20–107(a) (2001) (emphasis added); *see also Rearden v. Riggs Nat'l Bank,* 677 A.2d 1032, 1037 (D.C. 1996). Furthermore, the D.C.Code permits the trial court to consider allegations of fraud connected to a probate proceeding within two years of its discovery, D.C.Code § 20–108.01(a) (2001), and to consider an action to rescind a contract within three years, *id.* at § 12–301 (2007 Supp.); *cf. In re Johnson,* 820 A.2d 535, 539 (D.C.2003) (explaining that the "rescission of a will is akin to the rescission of a contract"). Thus, the trial court had jurisdiction to consider the petition.

## III.

### Misrepresentation

◼ Eltayeb next contends that there was insufficient evidence to justify the trial court's rescission of the assignment of rights made pursuant to the contract with McKenney. Here, we view the evidence in the light most favorable to McKenney, as the prevailing party, *Goldsmith v. Tapper,* 748 A.2d 416, 420 (D.C.2000), and can consider all of the evidence taken as a whole. *See Bragg v. Owens–Corning Fiberglas Corp.,* 734 A.2d 643, 649 (D.C.1999); *Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 177 (D.C.1998). We must accept the court's factual findings unless they are clearly erroneous. *See Zoob v. Jordan,* 841 A.2d 761, 764 (D.C. 2004).

Traditionally, a person who was induced to enter into a contract by a misrepresentation has several common law causes of action, including fraud in the inducement sounding in tort and rescission sounding in contract. The distinction between these two may be important because each action requires a different level of proof and allows for different remedies. "If the recipient of a misrepresentation seeks to hold the maker liable in tort for damages, tradition has it that the recipient must show that the misrepresentation was both fraudulent and material. If, however, the recipient seeks merely to avoid the contract, it is said to be enough to show that the misrepresentation was either fraudulent or material." 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 4.12, at 478–79 (3d. ed.2004) (footnotes omitted).

◼ Under the common law, the recipient of a fraudulent misrepresentation can recover monetary damages in tort, but only if he establishes all of the elements of common law fraudulent misrepresentation. *See* RESTATEMENT (SECOND) OF TORTS § 525,

at 55 (1977). Under this theory, the trial court must find by "clear and convincing evidence" that there was "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation...." *Park v. Sandwich Chef,* 651 A.2d 798, 801, 802 n. 3 (D.C. 1994).

 But as an alternative, the party to a contract can seek rescission relying on a material misrepresentation without establishing fraud. "The rescission of a contract is an action that we have concluded is equitable in nature because it is seeking to restore the aggrieved party to that party's position at the time the contract was made as opposed to seeking damages for breach of contract." *Johnson, supra,* 820 A.2d at 539. Fraud need not be proven to rescind a contract; instead, a party must only show that the misrepresentation "would have been likely to have induced a reasonable recipient to make the contract." FARNSWORTH, *supra,* § 4.12, at 480. The D.C. Circuit has explained that a party can sue for rescission of a contract without establishing all of the elements of fraud:

> It is well established that misrepresentation of material facts may be the basis for the rescission of a contract, even where the misrepresentations are made innocently, without knowledge of their falsity and without fraudulent intent. The rationale supporting this rule, which has its origins in equity, is that, as between two innocent parties, the party making the representation should bear the loss. Stated another way, the rule is based on the view that "one who has made a false statement ought not to benefit at the expense of another who has been prejudiced by relying on the statement." This rule may be employed "actively," as in a suit at equity or law

for rescission and restitution, or 'passively,' as a defense to a suit for breach of contract.

*Barrer v. Women's Nat'l Bank,* 245 U.S.App. D.C. 349, 354–55, 761 F.2d 752, 757–58 (1985) (footnotes omitted); *see also Lockwood v. Christakos,* 86 U.S.App. D.C. 323, 325, 181 F.2d 805, 807 (1950) ("There can be no doubt at this time that rescission may be had on account of innocent misrepresentations of material facts on which the party seeking relief relied to his detriment."); 26 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 69.29, at 614 (4th ed. 2003) ("[I]t is well established that innocent misrepresentation is a ground for rescission...."); RESTATEMENT OF RESTITUTION § 166 cmt. b, at 674 (1937). A further distinction between the two remedies is that the right to rescission may be proven by the normal preponderance of the evidence standard common to contract actions. *See Lockwood, supra,* 86 U.S.App. D.C. at 325, 181 F.2d at 807; 17 AM.JUR.3D *Proof of Facts* 287, § 9 at 311 (2000).

 Here, the trial court found that Eltayeb knowingly made fraudulent misrepresentations, which induced McKenney to agree to assign his property rights. The court concluded that Eltayeb falsely represented that the property was subject to imminent demolition and presented a man whom he claimed had the contract to demolish it. From testimony given at the hearing, the court found that Eltayeb knew that these representations were false, material, and made with an intent to deceive, and that McKenney reasonably relied upon them. Even if we assume that the proof was not sufficiently "clear and convincing" to constitute fraud in the strict sense, it was nonetheless sufficient to justify the rescission of the assignment under the principles for rescission set forth above.

Eltayeb argues that the proof is insufficient to show that the statements about imminent demolition were in fact untrue and known by Eltayeb to be so. This assertion is belied by the totality of the evidence. *See* 37 AM.JUR.2D *Fraud and Deceit* § 496, at 488 (2001) (citing cases) ("All of the facts and circumstances connected with and surrounding a transaction are to be considered together in determining whether it was fraudulent."). In its oral findings of fact, the trial court also found that Eltayeb misrepresented to McKenney that the property had no value and concealed the property's redemption value. There were, in addition, striking irregularities in preparation and presentation of the Petition for Probate, reflecting a possible overall plan of cover-up. And, most notably, Eltayeb's massive untruths in his testimony about the proceedings, as found by the trial judge, cast grave doubt on every aspect of the transaction:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood or other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Murphy v. McCloud,* 650 A.2d 202, 217 n. 29 (D.C.1994) (quoting II JOHN H. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed.1979)) (emphasis in original and other citations omitted).

Eltayeb also suggests that McKenney's reliance upon any misstatements was unjustified. It may be unreasonable to rely on a misrepresentation when the statement is "preposterous or obviously false," 37 AM.JUR.2D *Fraud and Deceit* § 239, at 265 (2001), or if there was an "adequate opportunity to conduct an independent investigation" and the party making the representation "did not have exclusive access to such information." *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 707 (D.C.1981). However, "it is settled that a defendant who prevents a plaintiff from making a reasonable inquiry may not benefit from the rule that requires a plaintiff to make such an inquiry in order to establish reasonable reliance." *FS Photo, Inc. v. PictureVision, Inc.,* 61 F.Supp.2d 473, 483 (E.D.Va.1999). Moreover, "a recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance [upon a misrepresentation] unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." RESTATEMENT (SECOND) OF CONTRACTS § 172, at 469 (1981). Here, it was not facially preposterous for the home to be subject to imminent demolition. McKenney thought that he had already lost the property after failing to pay property taxes for over ten years. Moreover, Eltayeb is hardly in a position to fault McKenney's acceptance of his assertions when he pressed McKenney vigorously for an immediate decision in the face of the impending demolition. On this record, we cannot say as a matter of law that McKenney's reliance was unreasonable.

In sum, there is sufficient evidence that Eltayeb made material misrepresentations that induced McKenney to enter into the agreement to support the trial court's action in voiding the assignment and the quitclaim deed.

## IV.

### Removal as Personal Representative

"A personal representative shall be removed from office upon a finding by the Court that such representative: (1) misrepresented material facts in the proceedings leading to the appointment...." D.C.Code § 20–526 (2001). Whether the misrepresentations made to McKenney to induce the assignment or the untruths he told in the hearing following his appointment would by themselves fall within this statutory provision are issues we need not linger on. Here, the facts as recited above reveal numerous irregularities in the preparation of the petition for probate, in its content, and in the initial hearing before the probate court sufficient, in the particular circumstances here and taken as a whole, to justify removal under the quoted section. Once such misrepresentations were found, the trial court was "statutorily bound to remove the personal representative." *In re Bates*, 948 A.2d 518, 524 (D.C.2008); *see* D.C.Code § 20–526 (2001). Accordingly, the judgment is affirmed.