**Sherry Miles St. Claire
DRAKE, Appellant**

v.

**James McNAIR, et al., Appellees.**

**No. 07–CV–445.**

District of Columbia Court of Appeals.

Argued July 16, 2008.
Decided April 29, 2010.

Donald M. Temple, Washington, DC, for appellant.

Eric P. Gotting, with whom Thomas M. Buchanan, Washington, DC, was on the brief, for appellee James McNair.

Leonard L. McCants entered an appearance for appellees Necia Drake and Tyrone Thompson.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and TERRY, Senior Judge.

TERRY, Senior Judge:

Appellant, Sherry Miles St. Claire Drake, appeals from the trial court's order dismissing her fraud and negligent misrepresentation claims against appellees, James McNair, Tyrone Thompson, and Necia Drake, each of whom has served or currently serves as personal representative and/or trustee for the estate and trusts of Sherry Drake's deceased husband, Carthur Drake. Sherry Drake's claims arise from the purchase of a piece of property on behalf of Carthur Drake shortly before his death. Mrs. Drake contends that the purchase of the property by a fictitious company and the subsequent transfer of ownership of the property to a company that is a beneficiary of Mr. Drake's trusts improperly converted an estate asset into a trust asset, thereby depriving her of her spousal interest in Mr. Drake's estate.

The trial court granted appellees' motion to dismiss, holding that Sherry Drake was on notice of any potentially fraudulent conduct and that her claims were therefore barred by the relevant statute of limitations. The court also held that a prior Settlement Agreement between Sherry Drake and appellees, which contained both an incorporation clause and a release clause, foreclosed her claims. Finally, the court held that the doctrine of *res judicata*, based on prior proceedings before the Probate Division, barred at least some of the claims. Sherry Drake argues on appeal (1) that the trial court made factual findings based on matters outside the complaint, thereby requiring the court to treat appellees' motion to dismiss under Super. Ct. Civ. R. 12(b)(6) as a motion for summary judgment under Super. Ct. Civ. R. 56, which would give her an opportunity to conduct additional discovery; (2) that her claims were not barred by the statute of limitations; (3) that her claims were not

barred by the Settlement Agreement; and (4) that her claims were not barred by *res judicata*. We reject the first three arguments. Since our decision on those three points necessarily resolves the entire case, we affirm the judgment without reaching the fourth.

## I[1]

At the time the Drakes were married in 1993, Mr. Drake had three daughters from previous relationships: Alvitra Drake, Leaph Drake, and Necia Drake. Mr. Drake died on July 29, 1995, of complications from acquired immune deficiency syndrome (AIDS), a disease which he had previously transmitted to Mrs. Drake. Although estranged, Mr. and Mrs. Drake remained legally married until Mr. Drake's death. At the time of his death, Mr. Drake owed significant amounts of money to the Internal Revenue Service (IRS).

### A. *Mr. Drake's Will and Trusts*

On July 21, 1995, just a few days before his death, Mr. Drake executed a Last Will and Testament and created two trusts: the Carthur L.M. Drake Trust and the Carthur L.M. Drake 1995 Family Trust (collectively, "the Drake Trusts"). In his will Mr. Drake bequeathed $250,000 to Mrs. Drake, but he did not name her as a trustee or a beneficiary of either trust. Instead he named his sister, Azalea Royster, and his attorney, James McNair, as co-trustees of both trusts, as well as co-personal representatives of his estate. Mr. McNair renounced and waived his rights to serve as co-personal representative of the estate on October 5, 1995. Ms. Royster chose to remain as personal representative of the estate but resigned as co-trustee of the trusts. Necia Drake currently serves as a successor co-trustee of the trusts; Tyrone Thompson, Necia Drake's husband, serves as the other successor co-trustee.

### B. *The Q Street Property*

On June 29, 1995, Mr. Drake instructed Mr. Thompson to purchase a piece of property located at 1204 Q Street, N.W. ("the Q Street property"), at a foreclosure sale. Thompson was the Chief Executive Officer of various businesses previously owned by Mr. Drake and designated as assets of the Drake Trusts, including Designmark Building Services, Inc., Designmark Food Services, Inc., and Designmark Development Corporation (collectively "Designmark"). Mr. Thompson purchased the Q Street property on behalf of a fictitious company named Taurus Investments Company ("Taurus")[2] and paid $155,000 for it with a cashier's check issued by Crestar Bank on behalf of Taurus; however, the purchase money for the cashier's check was provided by Designmark. On July 28, the day before Mr. Drake's death, the relevant parties executed a Substitute Trustee's Deed which stated that Taurus had purchased the Q Street property. The Substitute Trustee's Deed was recorded at the office of the District of Columbia Recorder of Deeds on August 24, 1995.

On August 18, about three weeks after Mr. Drake's death, Mr. Thompson was advised by Daniel Hodin, Designmark's attorney, a member of the law firm of Ginsburg, Feldman, and Bress, that the Substitute Trustee's Deed was invalid. Mr. Hodin informed Mr. McNair that without a change in title from Taurus to Design-

---

1. Our summary of the facts is drawn from the pleadings filed in the trial court and from the trial court's order granting appellees' motion to dismiss.

2. Taurus is not and has never been incorporated or registered under the laws of any state or the District of Columbia.

mark, the Q Street property could not be sold to satisfy Mr. Drake's outstanding IRS liabilities. He recommended to Mr. McNair that certain steps be taken to correct the deed. Richard Wise, counsel to the Substitute Trustee, required an affidavit from Mr. Thompson to effectuate the change in the deed. Hodin and Wise discussed the affidavit, and McNair spoke with Thompson about what it should say and later reviewed a draft of the affidavit. Mr. Thompson executed the affidavit ("Thompson Affidavit") on November 3.

A Confirmatory Substitute Trustee's Deed was then executed on November 20, 1995, to change the title of the Q Street property from Taurus to Designmark. This deed stated that (1) the original Substitute Trustee's Deed mistakenly named Taurus as the purchaser of the property, (2) Taurus was not incorporated or registered under the laws of any state or the District of Columbia, and (3) Designmark provided the purchase money for the Q Street property. The Confirmatory Substitute Trustee's Deed was recorded at the office of the Recorder of Deeds on January 16, 1996. Designmark later sold the Q Street Property for approximately $126,000, but the IRS attached the proceeds of the sale to satisfy some of Mr. Drake's business-related tax liabilities.

On August 21, 1995, three months before the Confirmatory Substitute Trustee's Deed was executed, Ms. Royster and Mr. McNair, in their capacities as co-trustees and co-personal representatives, wrote to Smith Barney, an asset management firm handling the Q Street property account. In their letter Royster and McNair agreed to indemnify Smith Barney against any and all claims or liabilities resulting from the retitling of its Taurus Investments account to a Drake Trusts account. On August 28, a week later, approximately $202,000 was transferred from Taurus to the Drake Trusts account.

## C. *Probate Proceedings*

On November 20, 1995, a petition for probate of Mr. Drake's estate was filed in the Probate Division of the District of Columbia Superior Court. Mr. Drake's will was admitted to probate on December 5, 1995. The probate court valued the estate at $53,000 and found that the estate was insolvent because its debts exceeded its assets.

On April 29, 1996, Mrs. Drake filed suit in the Probate Division against Ms. Royster and Mr. McNair, challenging the validity of Mr. Drake's will and trust documents. In her complaint as later amended,[3] she alleged (1) that Mr. Drake lacked the requisite testamentary and mental competency to execute the will and create the trusts, (2) that Mr. McNair had exerted undue influence on Mr. Drake, and (3) that her statutory right of spousal election was circumvented by the creation of the Drake Trusts and the transfer of estate assets to those trusts.[4] During discovery, Mrs. Drake deposed Mr. McNair. In his deposition Mr. McNair said that Designmark had purchased the Q Street property at the foreclosure sale, denied any involvement in the foreclosure, and stated that Mr. Hodin was involved only in pre-death matters for Mr. Drake.

On April 8, 1998, the parties in the probate litigation entered into a Settle-

---

3. In her First Amended Complaint, filed on May 3, Mrs. Drake added Alvitra Drake, Leaph Drake, and Necia Drake as defendants. On June 30 she filed a Second Amended Complaint.

4. On May 30, 1996, Mrs. Drake renounced her husband's will.

ment Agreement, which provided that Mrs. Drake would receive $450,000 and the title to a piece of property located at 1336 W Street, N.W.[5] The payment of all but $75,000 of that amount was conditioned on the resolution of significant IRS claims against the estate and the trusts. Since that date Mrs. Drake has received $75,000 but has not received any of the remaining $375,000 because of Mr. Drake's outstanding IRS liabilities.

### D. *Proceedings before the Special Master*

On March 25, 2003, the Probate Division removed Ms. Royster as personal representative of Mr. Drake's estate and appointed a Special Master to investigate certain allegations about her handling of the estate. Three months later, on June 25, the Special Master issued a Preliminary Report to the probate court, in the course of which he invited interested parties to state their objections to the inventory and statements of account previously filed by Ms. Royster. Mrs. Drake filed exceptions to the Special Master's Preliminary Report on July 24, asserting that numerous marital assets had been wrongfully diverted into the trusts. On May 10, 2004, the Special Master issued a Final Report and Recommendation, concluding that Mrs. Drake could not substantiate her claims of any impropriety on the part of Ms. Royster and that the Settlement Agreement barred Mrs. Drake from asserting claims against either the estate or Ms. Royster. The Special Master also approved Ms. Royster's statements of account.

Mrs. Drake filed an objection to the Special Master's Final Report, stating that after reviewing various court records and other documents, she was "convinced that the [Q Street] property may have been illegally converted from an estate asset to a Trust asset, that it may have been illegally sold, and that the proceeds from that sale may have been fraudulently converted to Trust and/or possibly personal assets." Mrs. Drake asserted that because Taurus was not incorporated, Mr. Drake purchased the Q Street property in his individual capacity and that the property should therefore be considered an estate asset. According to Mrs. Drake, "Designmark sought surreptitiously to place itself in the position of Taurus," and "someone yet known [*sic*][6] was able to manipulate apparent estate property into the Trust." Mrs. Drake asked the Special Master to order Mr. McNair to produce any documents related to Taurus's purchase and Designmark's sale of the Q Street property, and in addition to disclose his personal involvement in preparation of the Confirmatory Substitute Trustee's Deed.

Despite Mrs. Drake's objections, the probate court, in a brief order, approved the Special Master's Final Report on July 9, 2004.

### E. *The Instant Civil Action*

According to her brief, Mrs. Drake allegedly became concerned "in late 2003 ... about the purported ongoing negotiations" with the IRS over Mr. Drake's outstanding debts. On July 30, 2004, Mr. McNair, in a letter, provided Mrs. Drake for the first time with a copy of the Thompson Affidavit. Mrs. Drake now claims that the Thompson Affidavit revealed fraudulent activity of which she had not been previously aware because (1) Mr.

---

**5.** The Settlement Agreement contained both an incorporation clause and a release clause. See notes 22 and 23, *infra.*

**6.** From the context, we infer that this should read "someone not yet known" or "someone yet unknown."

Thompson failed to disclose to the Substitute Trustee that Taurus was the actual purchaser of the Q Street property; (2) Mr. Thompson made a deposit on the Q Street property in the name of Taurus; and (3) the check that paid for the balance owed on the property on July 27, 1995, was issued by Taurus. In July 2004 Mr. McNair also provided Mrs. Drake, allegedly for the first time, with copies of the checks submitted for payment on the Q Street property, one of which named Taurus as the purchaser of the property.[7]

On May 26, 2005, Mrs. Drake filed this civil action against Mr. McNair and Mr. Thompson alleging fraud in the inducement, fraudulent conversion, fraudulent misrepresentation, negligent misrepresentation, breach of contract, breach of good faith and fair dealing, breach of fiduciary duty, and civil conspiracy. Mrs. Drake filed an Amended Complaint on July 13[8] and a Second Amendment Complaint on August 28.[9] Underlying each of Mrs. Drake's claims was the assertion that appellees wrongfully diverted proceeds from the Q Street property, an estate asset, to the Drake Trusts, thereby depriving her of her spousal interest in her late husband's estate. Specifically, Mrs. Drake claimed that Mr. McNair gave disingenuous responses in his answers to her interrogatories during the earlier probate proceedings, that he falsely stated under oath that Designmark had acquired the Q Street

property during the foreclosure sale, and that Mr. Thompson had stated in his affidavit that he bid on the Q Street property "at the auction on behalf of Designmark."

Thereafter Mrs. Drake moved for summary judgment, whereupon appellees moved to dismiss her Second Amended Complaint on the grounds that it was barred by the applicable statute of limitations, by provisions of the Settlement Agreement, and by the doctrine of *res judicata*. Appellees then filed a Motion for Sanctions, arguing that Mrs. Drake's Second Amended Complaint and her claims regarding the Q Street property either lacked a factual basis or were not warranted by existing law. Mrs. Drake responded by filing a Third Amended Complaint, adding a claim for fraudulent circumvention of her distributive share of property interests as a surviving spouse.[10]

In due course the trial court issued a 32–page order granting appellees' motion to dismiss. The court concluded that, by the end of 1996, Mrs. Drake was on inquiry notice that she had an interest in the transfer of the Q Street property. The court noted that in November 1995 the Substitute Deed transferring title from Taurus to Designmark had been executed and recorded, that by April 1996 the property had been sold and the proceeds delivered as income to the Drake Trusts, and

---

**7.** In addition, Mrs. Drake claims that it was not until May 9, 2006, that she received notice of the August 21, 1995, letter from Ms. Royster and Mr. McNair to Smith Barney, purporting to indemnify Smith Barney from any and all claims or liabilities resulting from the change of its Taurus Investments account to a Drake Trusts account.

**8.** Mrs. Drake's Amended Complaint revised her factual allegations, amended her claim of breach of fiduciary duty to breach of a duty to the estate, and added a claim for a declaratory judgment that Mrs. Drake is the sole owner

of the stock in a corporation known as Hawk One.

**9.** Mrs. Drake's Second Amended Complaint contained only minor revisions to the factual allegations made in her Amended Complaint.

**10.** Mrs. Drake's Third Amended Complaint dropped her claims of fraudulent misrepresentation, breach of duty of good faith and fair dealing, and breach of duty to the estate, and her request for a declaratory judgment regarding the Hawk One stock ownership.

that the relevant land records were available to the public. The court also ruled that Mrs. Drake's claims were barred by the incorporation and release clauses in the Settlement Agreement (see notes 22 and 23, *infra*), as well as the doctrine of *res judicata*.[11]

Mrs. Drake filed a motion for reconsideration, which the trial court denied. This appeal followed.

## II

█ As we said earlier, Mrs. Drake argues on appeal (1) that the trial court made factual findings based on matters outside of the complaint, thereby requiring the court to treat appellees' Super. Ct. Civ. R. 12(b)(6) motion as a motion for summary judgment under Super. Ct. Civ. R. 56 and provide her an opportunity to conduct additional discovery; (2) that her claims are not barred by the statute of limitations; (3) that her claims are not barred by the Settlement Agreement; and (4) that her claims are not barred by *res judicata*.[12] We shall address the first three arguments in turn. Since we conclude that the trial court committed no error by proceeding under Rule 12 rather than Rule 56, and that either the statute of limitations or the Settlement Agreement, or both, barred all of Mrs. Drake's claims,

we affirm the judgment without reaching her *res judicata* argument.

### A. *The Rule 12(b)(6) Motion*

Mrs. Drake contends that the trial court made factual findings based on matters outside the pleadings, which required the court to treat appellees' Rule 12(b)(6) motion to dismiss as a motion for summary judgment under Rule 56. She was therefore entitled, she maintains, to an opportunity to conduct meaningful discovery to ascertain the true value of Mr. Drake's estate and to determine whether the Q Street property and proceeds from its sale should have been included as estate assets. *See* Super. Ct. Civ. R. 56(f) (court may order additional discovery when a party opposes a motion for summary judgment).

█ "Because a motion to dismiss a complaint under Rule 12(b)(6) presents questions of law, our standard of review is ... *de novo.*" *In re Estate of Curseen,* 890 A.2d 191, 193 (D.C.2006) (citations and internal quotation marks omitted). Rule 12(b) states in part:

> If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading* are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in

---

**11.** The court concluded that the doctrine of *res judicata* applied only to Mrs. Drake's claims against Necia Drake, who the court said was the sole party in the probate proceedings. Appellees challenge this part of the court's decision, asserting that Mr. McNair—in his capacity as a former trustee—was also a party. The court ruled in addition that Mrs. Drake's civil action was based on the same nucleus of facts as the probate action and that the Special Master's Final Report and Recommendation, which the probate court approved, was a final judgment (*i.e., res judicata*) on the merits of all her claims involving the Q Street property.

The trial court's reasoning on the *res judicata* issue is not entirely clear. However, as we shall explain, we need not decide whether *res judicata* bars some or all (or none) of Mrs. Drake's claims because we can affirm the judgment on other grounds.

**12.** Mrs. Drake's brief also states that one of the issues presented for review is whether her Third Amended Complaint was time-barred. Because she has failed to include in her brief any substantive argument related to this issue, however, we deem it waived.

Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. [Emphasis added.]

It is well established, however, that despite this language, a trial court may consider public documents without converting a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56. See Smith v. Public Defender Service, 686 A.2d 210, 212 (D.C.1996) (holding that "a number of opinions and orders [in other cases], as well as a brief and a transcript," were not "matters outside the pleading" within the meaning of Rule 12(b), and citing cases to the same effect involving other types of "public records").

■ We hold, for two reasons, that the trial court's reliance on facts set forth in public land records did not transform appellee's Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. First, Mrs. Drake herself made several references to the contents of the deeds throughout her pleadings and amended pleadings.[13] In Oparaugo v. Watts, 884 A.2d 63 (D.C.2005), we held that "when 'a document is referred to in the complaint and is central to plaintiff's claim ... the defendant may present an authentic copy [of that document] to the court without converting the motion to one for summary judgment." Id. at 76 n. 10 (citing Greenberg v. Life Insurance Co. of Va., 177 F.3d 507, 514 (6th Cir.1999)). Second, this court has held that reference to matters in public records, which include recorded deeds, will not convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion. Smith, 686 A.2d at 212 (holding that matters of public record are not treated as matters outside the pleadings) (citing Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir.1986)); see Wise v. Glickman, 257 F.Supp.2d 123, 130 n. 5 (D.D.C.2003) (court is "allowed to take judicial notice of matters in the general public record, including records and reports of administrative bodies and records of prior litigation, without triggering the conversion requirement"). Moreover, the court relied on these public land records merely to conclude that if Mrs. Drake "had ... conducted any reasonable inquiry into the purchase and subsequent sale of the Q Street property, she would have gained actual knowledge well before June 2004."

We hold, therefore, that the trial court did not err in considering the Substitute Trustee's Deed, conveying title in the Q Street property, and the Confirmatory Substitute Trustee's Deed, transferring that title from Taurus to Designmark, because Mrs. Drake made reference to those deeds in her pleadings and because the deeds are, in any event, public records.[14] See In re Estate of Barfield, 736 A.2d 991, 995 n. 8 (D.C.1999) ("the trial court is entitled to take judicial notice of matters of public record" when considering a motion to dismiss under Rule 12(b)(6)). The court was under no obligation to treat the motion to dismiss as a motion for summary judgment or to allow Mrs. Drake to con-

---

13. For example, Mrs. Drake's Amended Complaint and Second Amended Complaint referred specifically to the Substitute Trustee's Deed and the Confirmatory Substitute Trustee's Deed. Her Third Amended Complaint referred to the Substitute Trustee's Deed generally and the Confirmatory Substitute Trustee's Deed specifically.

14. The Substitute Trustee's Deed was recorded on August 24, 1995. The Confirmatory Substitute Trustee's Deed was recorded on January 16, 1996. Mrs. Drake filed her complaint in the instant case on May 26, 2005.

duct additional discovery.[15]

## B. *The Statute of Limitations*

Mrs. Drake argues that the trial court erred when it granted appellees' motion to dismiss on the ground that she was on inquiry notice of the purchase and subsequent sale of the Q Street property prior to June 2004. The court noted that publicly available land records—the Substitute Trustee's Deed and the Confirmatory Substitute Trustee's Deed—revealed the transfer of the Q Street property from Taurus to Designmark. The court also pointed out that Mrs. Drake had an interest in, and reasons to inquire about, the Q Street property well before June 2004. Mrs. Drake contends, however, that the "undisclosed and unmentioned Thompson Affidavit" is the only document that could have placed her on constructive notice of the alleged fraud, and asserts in addition that Mr. McNair's "disingenuous, misleading and arguably false responses ... lulled [her] into a state of ignorance until July 30, 2004."

The statutory limitation period governing Mrs. Drake's fraud and misrepresentation claims is three years. *See* D.C.Code § 12–301(7), (8) (2001). A statute of limitations begins to run when a plaintiff has either actual or inquiry notice of (1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *Diamond v. Davis*, 680 A.2d 364, 379–380 (D.C.1996). "The critical question in assessing the existence ... of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Ray v. Queen*, 747 A.2d 1137, 1141–1142 (D.C.2000). "What constitutes acting reasonably under the circumstances ... is a 'highly factual analysis,'" *In re Estate of Delaney*, 819 A.2d 968, 982 (D.C.2003) (citation omitted), which takes into account "the conduct and misrepresentations of the defendant ... and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Diamond*, 680 A.2d at 372. It is true that "in a fraud case, the statute of limitations will not begin running until the date the fraud is discovered, or reasonably should have been [discovered]." *Kropinski v. World Plan Executive Council—US*, 272 U.S.App. D.C. 17, 24, 853 F.2d 948, 955 (1988) (citations omitted). Nevertheless, a party with immediate suspicions of wrongdoing has an "obligation to move promptly and with reasonable diligence to inquire further into the matter." *Estate of Delaney*, 819 A.2d at 982. "The discovery rule does not ... give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm." *Hendel v. World Plan Executive Council*, 705 A.2d 656, 661 (D.C.1997); *accord, Colbert v. Georgetown University*, 641 A.2d 469, 473 (D.C.1994) (en banc). Moreover, it is well

---

**15.** Even assuming, for the sake of argument, that the trial court's consideration of the Substitute Trustee's Deed and the Confirmatory Substitute Trustee's Deed converted appellees' motion to dismiss into a motion for summary judgment, Mrs. Drake would not necessarily prevail on this point. A trial court is not required to order discovery when considering a motion for summary judgment. *See* Super. Ct. Civ. R. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the Court ... *may* order a continuance to permit ... discovery to be had" (emphasis added)). In other words, the court has discretion not to authorize additional discovery under Rule 56(f). We would be hard pressed on this record to find an abuse of discretion by the trial court that would warrant reversal.

established that "*general* knowledge that [the defendant's conduct] was wrongful," rather than knowledge of the "*precise* legal remedies for [that wrongful conduct]," is the focus of this discovery rule. *East v. Graphic Arts Industry Joint Pension Trust*, 718 A.2d 153, 157 (D.C.1998) (emphasis in original).

■ "[A] plaintiff guilty of ordinary negligence in not earlier discovering a cause of action may not avoid the bar of the statute of limitations merely because a fraud or fraudulent concealment is involved." *Diamond*, 680 A.2d at 375–376 (citations omitted); *see also Robinson v. Orem*, 91 U.S.App. D.C. 96, 97, 198 F.2d 86, 87 (1952) (purchaser barred by statute of limitations from filing an action for fraud and misrepresentation against a seller of land, when the purchaser had constructive notice of public records containing precise metes and bounds of the property more than three years before he filed suit, and when both the contract of sale of land and the deed precisely identified the property by lot and square number); *District–Florida Corp. v. Penny*, 62 App. D.C. 268, 269, 66 F.2d 794, 795 (1933) (holding that "information contained in the abstract [of title] was available to the plaintiff before the receipt of the abstract, and more than three years [the limitation period] before the filing of the suit, for it was all contained in the land records ... and consequently [was] all within the constructive notice of the purchaser").

### 1. *Public Land Records*

Appellees argue, and we agree, that the Thompson Affidavit merely reiterated facts already available in the public land records. That affidavit states that Mr. Thompson made a bid for the Q Street property on behalf of Designmark when it was sold at auction on June 29, 1995. After his bid was accepted, Thompson paid for the property with Designmark funds but told the auctioneer that he was an agent of Taurus, a fictitious entity and alter ego of Designmark.[16] Mr. Thompson then received a deed conveying the Q Street property to Taurus. Later, however, when he consulted with the law firm of Ginsburg, Feldman, and Bress, counsel to Designmark, he was advised that the deed was invalid. Mr. Thompson then instructed Daniel Hodin, an attorney from Ginsburg, Feldman, and Bress, where Mr. McNair was a partner, to return the deed to the auctioneer and request a valid deed conveying the Q Street property to Designmark. That was done.[17]

The Substitute Trustee's Deed and the Confirmatory Substitute Trustee's Deed revealed all of the facts necessary to support Mrs. Drake's claim of fraud.[18] These two deeds showed that Taurus, a fictitious entity, had originally purchased the Q Street property and that the property thereafter had been conveyed to Design-

---

16. It is not clear from the affidavit whether Mr. Thompson actually told the auctioneer that Taurus was a fictitious entity.

17. The Confirmatory Substitute Trustee's Deed, which was duly recorded, named Mr. Hodin as the person to whom the deed should be returned upon recordation.

18. The Substitute Trustee's Deed, dated July 28, 1995, and recorded on August 24, 1995, stated that Taurus had purchased the Q Street property. The Confirmatory Substitute Trustee's Deed, dated November 20, 1995, and recorded January 16, 1996, stated that the Substitute Trustee's Deed had mistakenly named Taurus as the purchaser of the Q Street property, that Designmark had actually provided the purchase money for the property, and that Taurus was not incorporated or registered under the laws of any state or of the District of Columbia.

mark, which Mrs. Drake already knew was a beneficiary of the Drake Trusts. Mrs. Drake was therefore on inquiry notice that the Q Street property might have been transferred from an estate asset (assuming that the non-existent Taurus was not acting as the alter ego of Designmark) to a trust asset. In addition, the Confirmatory Trustee's Deed revealed Mr. Hodin's involvement in the transfer of the Q Street property. The Thompson Affidavit contained no additional information, beyond that contained in the two deeds, that would have supported Mrs. Drake's claims of fraud.

The only document that potentially contained additional pertinent information was the letter from Ms. Royster and Mr. McNair to Smith Barney, in which they, as personal representatives of Mr. Drake's estate, agreed to indemnify Smith Barney for any liability resulting from the retitling of the Q Street property. Mrs. Drake now argues that this letter supports her assertion that Taurus was a distinct legal entity because it had an account with Smith Barney, and thus that Taurus was not acting as the alter ego of Designmark when it purchased the Q Street property, but rather as an agent of Mr. Drake. Although the Royster–McNair letter did contain information unavailable in either the public land records or Mr. McNair's 1997 deposition, we find it significant that Mrs. Drake did not even become aware of the letter until August 7, 2007 (according to her reply brief), more than two years after she filed this suit in May 2005. The conclusion is inescapable that ample information from other sources prompted her to file this suit, and that the Royster–McNair letter has no bearing on this appeal.

2. *Mr. McNair's 1997 Deposition*

 Despite the existence—and availability—of public land records revealing the facts underlying Mrs. Drake's fraud claims, Mrs. Drake asserts in her brief that Mr. McNair's "misleading" responses during his 1997 deposition, as well as the undisclosed and unmentioned Thompson Affidavit, which we have already discussed, "lulled her into a state of ignorance until July 30, 2004." Specifically, she contends that Mr. McNair affirmatively concealed the alleged fraud by providing three misleading answers to questions posed during that deposition: (1) that Designmark purchased the Q Street property, (2) that he (McNair) played no role in the purchase of the property, and (3) that Mr. Hodin worked only on pre-death matters for Mr. Drake. We conclude that Mrs. Drake could not reasonably have relied on these alleged misrepresentations and, therefore, that she failed to allege facts sufficient to toll the statute of limitations.

 "It is well established that affirmative acts employed by a party to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action toll the running of limitations periods." *Estate of Chappelle v. Sanders*, 442 A.2d 157, 158 (D.C.1982) (citations omitted); *accord, William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C.1980) ("[t]he defendant's affirmative efforts to divert or prevent discovery of the original fraud give a continuing character to the original act which deprives it of statute of limitations protection until discovery"). A mere failure to disclose pertinent information, however, is not sufficient to toll the statute of limitations unless there has been some affirmative act of concealment. "It has consistently been the law in the District of Columbia that fraudulent concealment requires 'something of an affirmative nature designed to prevent discovery of [a] cause of action.'" *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 773–774 (D.C.1998) (quoting *Young*, 412 A.2d at 1191–1192).

■ These and similar cases, read together, have established a requirement of due diligence and imposed it on a plaintiff who seeks to take advantage of the discovery rule. "Thus ... a plaintiff guilty of ordinary negligence in not earlier discovering a cause of action may not avoid the bar of the statute of limitations merely because a fraud or fraudulent concealment is involved.... [T]he presence of a fraudulent misrepresentation does not excuse the injured party from acting reasonably to protect her interests." *Diamond,* 680 A.2d at 375–376 (citations omitted). However, "[i]n evaluating the reasonableness of the plaintiff's diligence, cases from this jurisdiction have long taken into account the confidential or fiducial relationship between the plaintiff and defendant." *Id.* at 376. "[I]n a close, confidential relationship, the degree of reasonable reliance is likely to be much greater—and the reasonable diligence on the part of the plaintiff much less—than would exist where the parties had been in an adversary relationship." *Id.* at 378; *see also Firestone v. Firestone,* 316 U.S.App. D.C. 152, 156, 76 F.3d 1205, 1209 (1996) (failure to disclose information may be sufficient to establish fraudulent concealment when one party has a fiduciary obligation to the other party). We must therefore examine the record to determine, first, whether Mrs. Drake exercised sufficient diligence to avoid the bar of the statute of limitations and, second, whether she and Mr. McNair were in a fiduciary relationship that would excuse, or at least reduce the significance of, any lack of diligence on her part.

According to Mrs. Drake's brief, "[a]t no time did McNair disclose his role in the preparation or supervision of Thompson's October 26, 1995 affidavit or that he subsequently became involved in changing the name on the deed to indicate that Designmark had purchased the property at the foreclosure." We conclude that Mr. McNair's responses during his deposition, although they may have been potentially misleading, were not technically incorrect. For example, when asked, "Who purchased the [Q Street property] in the foreclosure?", Mr. McNair responded, "Designmark Development Corporation." While it is true that Taurus—and not Designmark—purportedly bought the property in July 1995, shortly before Mr. Drake's death, the property was retitled just a few months later to reflect that Designmark was the actual purchaser.[19] In addition, when asked about his role in the foreclosure, Mr. McNair stated, "I had some discussions with [Mr. Drake] prior to his death regarding that property, and my advice to him generally was to walk away from it." Although this statement minimized Mr. McNair's role in the retitling of the property, he went on to explain that he was involved in the transfer of the Q Street property proceeds to the Drake Trusts. He testified in his deposition that he frequently consulted with a representative of Mr. Drake's estate to discuss execution of the will and the trust instruments, as well as the transfer of assets.

■ We are not persuaded that these statements, even if they can be regarded as evasive, rise to the level of active concealment, nor do they warrant depriving Mr. McNair and the other appellees of the protection of the statute of limitations. *See Cevenini,* 707 A.2d at 774 ("we are unwilling to hold that a failure to disclose information that has not even been requested constitutes fraudulent concealment"); *Young,* 412 A.2d at 1191 ("Generally the defendant must have done something of an affirmative nature de-

19. Appellees maintain that Taurus was acting as the alter ego of Designmark, so that Designmark was actually the initial purchaser of the Q Street property.

signed to prevent discovery of the cause of action"). Furthermore, Mrs. Drake cannot be excused from taking steps to protect her own interests, especially when Mr. McNair owed her no fiduciary obligation. Even if representations are false or misleading, it is unreasonable for a party to rely on those representations if the party had "an 'adequate opportunity to conduct an independent investigation' and the party making the representation 'did not have exclusive access to such information.'" *In re Estate of McKenney,* 953 A.2d 336, 343 (D.C.2008) (citing *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 707 (D.C.1981)).[20]

We note that Mr. McNair incorrectly stated during his deposition that Mr. Hodin worked on pre-death—and not post-death—matters for Mr. Drake. Nevertheless, we are satisfied that this statement, even assuming that it was intentionally false, did not toll the statute of limitations. As we pointed out earlier, Mr. McNair had no continuing fiduciary duty to Mrs. Drake because he had previously relinquished his appointment as co-personal representative of Mr. Drake's estate.[21] In addition, Mrs. Drake was already on inquiry notice of Mr.

Hodin's involvement in the foreclosure sale of the Q Street property because Hodin's name appeared on the Confirmatory Substitute Trustee's Deed as the person to whom the deed should be returned after it was recorded. Thus it would not have been reasonable for Mrs. Drake to rely on any suggestion by Mr. McNair that Mr. Hodin was involved exclusively with pre-death matters. *See Diamond,* 680 A.2d at 376 ("the presence of a fraudulent misrepresentation does not excuse the injured party from acting reasonably to protect her interests").

### C. The Settlement Agreement

The trial court, relying on *One-O-One Enterprises, Inc. v. Caruso,* 270 U.S.App. D.C. 251, 848 F.2d 1283 (1988), and *Hercules & Co. v. Shama Restaurant Corp.,* 613 A.2d 916, 923 (D.C.1992), held—independently of the statute of limitations—that the incorporation clause in the parties' 1998 Settlement Agreement barred Mrs. Drake's claims that appellees made fraudulent or negligent misrepresentations which induced her to enter into the agreement.[22] According to the trial court, "if

**20.** Mrs. Drake has not made a sufficient showing that any actionable fraud was committed on the court. Fraud on the court is "confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Partnership Placements, Inc. v. Landmark Insurance Co.,* 722 A.2d 837, 844 (D.C.1998) (citation omitted). Mr. McNair's evasive deposition testimony cannot be compared to the actions of the defendants in *Synanon Foundation, Inc. v. Bernstein,* 503 A.2d 1254, 1259–1262 (D.C.1986), who engaged in an extensive and ongoing scheme to destroy incriminating evidence requested during discovery.

**21.** On August 21, 1995, Mr. McNair and Ms. Royster sent a letter to Smith Barney asking the firm to change the account title for the Q

Street property. This letter listed Mr. McNair as co-personal representative of the estate and was signed by him in that capacity. Mr. McNair relinquished his position as co-personal representative on October 5, 1995. The petition for probate, filed November 30, 1995, stated that Mr. McNair had declined to serve as co-personal representative of the estate.

**22.** The incorporation clause reads as follows:
This Settlement Agreement constitutes the full and final agreement of the parties hereto concerning the subject matter of the Litigation and/or the claims (including both asserted and unasserted claims) released hereby. There are no other representations or agreements between the parties, whether written or oral. All prior discussions or negotiations of any nature whatsoever are deemed to have been merged into this Settlement Agreement. No representation or understanding not contained in the Settle-

[Mrs. Drake] considered the representations important enough to have induced her to agree, she and her attorneys should have demanded that those representations be included in the [Settlement Agreement]." On appeal Mrs. Drake contends that this incorporation clause in no way bars her claims because the agreement itself was procured by fraud.

The trial court also concluded that the release provision in the Settlement Agreement "remains in effect and thus bars [Mrs. Drake's] claims."[23] Mrs. Drake does not raise any specific challenge to this ruling, but rather asserts that the release clause, like the incorporation clause, does not bar her claims because the alleged fraudulent representations "transcend statements made during negotiations" and involve representations made and omissions that occurred during discovery and litigation. She further argues that the Settlement Agreement was void *ab initio* because it was procured by fraud. We reject all of these contentions because Mrs. Drake has failed to substantiate any claim of fraud that would invalidate the Settlement Agreement.

■■■ "At common law, the requisite elements of fraud were (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation.... At least in cases involving commercial contracts negotiated at arm's length, there is the further requirement (6) that the defrauded party's reliance be *reasonable." Hercules,* 613 A.2d at 923 (citations omitted; emphasis in original). "[I]n the absence of a showing that a parol representation made during negotiations by a party to a completely integrated contract was omitted from the contract by fraud, mistake, or accident ... the opposing party is barred from relying on such a representation as material to its acceptance of the deal and from claiming that its reliance on it was reasonable." *Id.* at 929 (citation omitted); *see also In re U.S. Office Products Co. Securities Litigation,* 251 F.Supp.2d 77, 102 (D.D.C.2003) ("Unless the plaintiffs allege that the representation omitted from the contract was omitted by fraud, mistake or accident, an integration clause bars representations not contained in the contract even when the plaintiffs allege fraudulent inducement to enter the contract" (citations omitted)).

In the *One–O–One* case, the United States Court of Appeals, applying District of Columbia law relating to common law fraud, rejected One–O–One's claims of fraud in the inducement. One–O–One, a Maryland corporation which owned and operated a chain of Ponderosa Steak Houses, entered into an agreement with Caruso and Sullivan, controlling stockholders in a Pennsylvania corporation which owned and operated Rustler Steak Houses. That agreement conveyed ten of One–O–One's Ponderosa Steak Houses to Caru-

---

ment Agreement and Mutual Release shall be considered to have any effect.

**23.** The release clause reads as follows:

Plaintiff [Mrs. Drake] hereby expressly and irrevocably releases, acquits and discharges [appellees] of and from any and all claims, causes of actions or complaints of any nature whatsoever that have arisen or have accrued up to the date hereof including, but not limited to, those that have been or could have been asserted against any of the foregoing persons or entities or that could have been asserted against them in the Litigation or in any way arising from or respecting any relationship whatsoever which [Mrs. Drake] had with [Mr. Drake] or with any of the persons or entities mentioned in this paragraph. This release includes not only asserted claims but unasserted claims whether the same are known or unknown to [Mrs. Drake].

so and Sullivan and authorized One–O–One to convert and operate twenty-five of its restaurants as Rustler Steak Houses. According to One–O–One's complaint, Caruso and Sullivan allegedly made oral representations that they would retain a controlling interest in the Rustler Steak Houses and would undertake a long-term commitment to maintain and expand the Rustler restaurants. The final agreement between the parties, however, contained no mention of this alleged long-term commitment, and Caruso and Sullivan eventually sold their corporation to Sizzler Restaurants, Inc.[24]

In analyzing One–O–One's claims of fraud in the inducement, the court noted that the final agreement between the parties included an integration clause stating that the agreement "supersede[d] any and all previous understandings and agreements." 270 U.S.App. D.C. at 254, 848 F.2d at 1286. According to the court, this language "made any reliance by plaintiffs on prior representations concerning [Caruso and Sullivan's] long-term commitment to the Rustler operation unreasonable and any failure by [Caruso and Sullivan] to disclose the existence of negotiations with Sizzler immaterial." *Id.* The court held that "silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment or excision of those earlier representations." *Id.* at 255, 848 F.2d at 1287 (citation omitted).

This court considered a similar fraud-in-the-inducement claim in the *Hercules* case. Hercules and Company had contracted with Shama Restaurant Corporation to renovate Shama's restaurant in Alexandria, Virginia. The contract between Hercules and Shama contained a general integration clause which stated that the contract "constitute[s] the entire agreement between" the parties.[25] Hercules argued that Shama represented generally that it had the financial stability to satisfy its obligations under the contract and represented specifically that it was depositing money in a money market account for construction on the project, but these representations were not included in the written contract. After analyzing *One–O–One,* this court concluded that Hercules had failed to demonstrate that the representations at issue were either material or reasonably relied upon because they were not included in the final, fully integrated agreement between Hercules and Shama. We reasoned, "If Hercules considered these assurances important enough to induce it to agree to the contract ... it could have conditioned its agreement on the explicit inclusion of those representations in the contract." 613 A.2d at 932. By the same rationale, we concluded that Hercules' reliance on any representation not included in the final written contract could not have been reasonable. *Id.* at 934 ("the reasons for holding that Hercules' complaint was deficient as to the element of materiality apply equally to the question whether Hercules' reliance was reasonable").[26]

---

24. As a result of the sale to Sizzler, the level of promotional effort devoted to the Rustlers diminished, and One–O–One's Rustler restaurants performed poorly. *One–O–One,* 270 U.S.App. D.C. at 253, 848 F.2d at 1285.

25. The contract also contained an arbitration clause, "stating that the parties agreed to have all disputes arising out of the project resolved by independent arbitrators...." *Hercules,* 613 A.2d at 918.

26. It is worth noting that our holding in *Hercules* was based on the "especially compelling" policies against circumventing the parol evidence rule when a party is seeking to avoid an arbitration clause. We emphasized that "[w]e need not ... decide whether we should follow cases like *One–O–One* ... in the generality of 'fraud in the inducement' disputes." 613 A.2d at 931.

In *Whelan v. Abell*, 310 U.S.App. D.C. 396, 48 F.3d 1247 (1995), the District of Columbia Circuit qualified to some extent its holding in *One-O-One*. Rejecting the appellants' "rather broad reading" of that decision, the court in *Whelan* said:

> [O]ur conclusion in [*One-O-One*] was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally or confines them to claims of fraud in execution.... Such a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate.

*Id.* at 407, 48 F.3d at 1258 (citation omitted). The court noted specifically that two of the three alleged claims of fraud in *One-O-One* were based on alleged oral promises of future behavior, and that the third alleged claim of fraud involved concealment of negotiations that "were at worst in violation of the first two alleged promises." *Id.*

■ Although the court did not engage in any significant discussion of the differences between the fraud claims in *One-O-One* and those at hand in *Whelan*, and although the discussion of fraud in the inducement in *One-O-One* is technically dictum, we agree with the court's general statement in *Whelan* that an integration clause does not provide a blanket exemption to claims of fraud in the inducement.[27] We are satisfied, however, that the *Whelan* court was correct in distinguishing allegedly fraudulent representations with regard to promises of future behavior. *See Hercules*, 613 A.2d at 918–919 (involving allegations that Shama's misrepresentation that it would deposit money into an account to satisfy obligations under the contract induced Hercules to agree to include an arbitration clause in the contract); *One-O-One*, 270 U.S.App. D.C. at 253, 848 F.2d at 1285 (involving allegations that Caruso and Sullivan's promise that they did not intend to sell or dispose of their interest in Rustler, although not included in the final, fully integrated agreement, fraudulently induced One–O–One to enter into the contract).

[20] When a written contract contains an incorporation clause, any alleged prior representations that a party will or will not do something in the future that are not included in that written contract generally do not support a fraud-in-the-inducement claim. On the other hand, prior representations that conceal fraudulent conduct, thereby precluding a party from filing suit within the statute of limitations period, may provide support for such a claim. Here, we respect that distinction and note that Mrs. Drake's allegations involved representations that may have shielded fraudulent conduct and information which allegedly would have enabled her to file her suit before the statute expired.

■ Nevertheless, we conclude that Mrs. Drake has not demonstrated that she was fraudulently induced to sign the Settlement Agreement. She cannot claim to have reasonably relied on any representations made by Mr. McNair during his deposition. At the time the deposition was taken, Mr. McNair was no longer the personal representative of Mr. Drake's estate and thus no longer owed any fiduciary duty to that estate or its beneficiaries, including Mrs. Drake. *See Hercules*, 613 A.2d at 934 (citing *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 672 (N.D.Ga.1982) ("One cannot close his eyes and blindly rely upon

---

27. In addition, the parties in the case at bar did not explicitly debate the veracity of the representations. *See Adler v. Abramson*, 728 A.2d 86, 90 (D.C.1999) ("The absence from the signed lease of a limitation on which the parties had explicitly bargained, in a final agreement containing an integration clause (as this one did), is strong indication that the parties reasonably meant to bind themselves only by the words they employed").

the assurances of another absent some fiduciary relationship or emergency"), *aff'd sub nom. Computer Dimensions v. Basic Four*, 747 F.2d 708 (11th Cir.1984)). If Mrs. Drake had any suspicions about the transfer of property from the estate to the trusts, she should not have signed the Settlement Agreement in the first place; rather, she should have taken affirmative steps *at that time* to investigate any possible fraud. *See Estate of McKenney*, 953 A.2d at 343.[28] We therefore hold that there is no allegation of fraud in this case sufficient to prevent enforcement of the Settlement Agreement.

## III

Our holdings with respect to the Rule 12(b)(6) motion, the statute of limitations, and the Settlement Agreement necessarily dispose of all of Mrs. Drake's claims. We agree with the trial court that all of those claims were barred either by the statute of limitations or by the Settlement Agreement, or both. We therefore need not consider, and do not consider, any issue regarding *res judicata*.[29] The judgment is accordingly

*Affirmed.*

---

28. It should also be emphasized that Mrs. Drake was represented by counsel during the settlement negotiations and was under no duress when she signed the Settlement Agreement. *See Hercules*, 613 A.2d at 932 (noting that each party was "represented by competent counsel" and that they "engaged in arm's length negotiations before reaching agreement" in concluding that the parties were bound by their agreement).

29. We note that it was the 1998 Settlement Agreement, not the 2004 Special Master's Report, which resulted in the final adjudication of the earlier probate litigation—a fact which the trial court and both parties may have overlooked. In any event, appellant's present complaint, filed in 2005, arises from the same set of facts and circumstances that were the subject of the Settlement Agreement and thus is barred by it.